**J. Herbert FRANCISCO, Respondent,**

v.

**The KANSAS CITY STAR COMPANY, Appellant.**

**No. WD 31520.**

Missouri Court of Appeals, Western District.

Nov. 24, 1981.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Jan. 8, 1982.

Application to Transfer Denied Feb. 16, 1982.

John T. Martin, Sam L. Colville, Dennis R. Dow, Kansas City, for appellant.

M. Randall Vanet, Kansas City, for respondent.

Before MANFORD, P. J., and DIXON and NUGENT, JJ.

MANFORD, Presiding Judge.

This appeal follows a jury award of $43,327.00, representing damages upon a claim for tortious interference of contract. The judgment is reversed.

Appellant presents eight points of error. Because of the disposition herein, consideration of only one alleged error suffices. In summary, appellant charges the trial court erred in denying its motion for a directed verdict because there was no substantial evidence to support respondent's claim that appellant's actions were done with intent to cause a breach of contract and were done without justification.

On July 21, 1972, respondent entered into a contract with appellant to distribute newspapers in Chillicothe, Missouri commencing August 1, 1972. Respondent made a security deposit to cover any amount that might be due appellant periodically for newspapers purchased by respondent on account. The relevant parts of the contract between appellant and respondent are as follows:

"1. THE DISTRIBUTOR [respondent] agrees to purchase from THE STAR [Company], and THE STAR agrees to sell to DISTRIBUTOR, a sufficient number of copies of The Kansas City Star, The Kansas City Times, and The Kansas City Sunday Star as will enable the DISTRIBUTOR to make regular daily delivery of the same to all of the regular subscribers for said newspapers at Chillicothe, Missouri.

2. The DISTRIBUTOR agrees that he will deliver promptly each issue of The Kansas City Star, The Kansas City Times, and The Kansas City Sunday Star, each day upon receipt of the same, to the regular subscribers for said newspapers, and the dealers and newsboys located at the place hereinabove specified.

\* \* \* \* \* \*

8. The DISTRIBUTOR shall not assign or transfer this contract or any part hereof, unless the written consent of THE STAR be first had and obtained.

\* \* \* \* \* \*

10. This agreement may be terminated by either party hereto at any time by either party giving to the other thirty days' notice in writing of his or its election to terminate the same.

\* \* \* \* \* \*

11. The DISTRIBUTOR is not in any sense an agent, servant, or employee of THE STAR, but is in every sense an independent contractor, and has no right, power, or authority to bind THE STAR upon any obligation of any kind, character, or nature whatsoever."

Before assuming his duties as distributor, respondent entered into an agreement with Robert Lynch, the previous Chillicothe distributor, whereby respondent would pay Lynch $35,000 for the distributorship. Respondent paid Lynch $11,500 in cash and executed a loan, a promissory note through the Chillicothe State Bank for the $23,500 balance.

A few months after respondent began distributing newspapers, appellant determined that there had been several instances of unsatisfactory service. As a result, appellant sent respondent a notice of the cancellation of its contract with respondent by letter dated November 29, 1972 with cancellation to be effective December 30, 1972. However, prior to the effective cancellation date, the parties agreed to extend the cancellation date to March 1, 1973, during which respondent would have an additional opportunity to improve his services in Chillicothe. On January 16, 1973, a few weeks after the extension agreement was executed, respondent sustained injuries from a fall while distributing papers. As a result, he sent a letter to appellant expressing the intention to terminate his contract effective March 31, 1973. This letter was received by

appellant on February 19, 1973. In a letter to respondent dated March 7, 1973, appellant acknowledged the receipt of respondent's intention to terminate his distributorship and acceded to the March 31, 1973 termination date. The letter also informed respondent that "... any contract negotiations and signings with a new distributor who is satisfactory to The Star must be completed with The Star prior to March 15, 1973. Otherwise, The Star will make other arrangements for the distribution of the papers."

The next contact between the parties to this action took place on March 21, 1973, when respondent told Mr. Glen Peer, a representative of appellant that the last day of March was his final day of delivery and that he owed the customers a notice that he would quit which he would send by Friday, March 23, 1973. The notice was sent on or about that date, and informed the customers that all matters concerning delivery of the Kansas City Times, Kansas City Star and Sunday Star newspapers would be received at various telephone numbers belonging to appellant and its representatives.

During the latter part of March, 1973, Mr. Henry Brzyski heard that respondent was relinquishing his Star distributorship in Chillicothe. Brzyski was employed as a teacher at Chillicothe High School and also worked part-time for H. & R. Block preparing income tax returns. He had previously given notice that he would no longer teach and was actively seeking other employment. This led to Brzyski contacting respondent to inquire about taking over the Chillicothe distributorship. In the course of this inquiry, respondent showed Brzyski a "route book" which contained the names and addresses of newspaper subscribers and also drove Brzyski around a portion of respondent's distribution route. As a result of this inquiry, respondent and Brzyski reached the following tentative oral agreement:

Respondent would "sell the route" together with a truck and newspaper tying machine to Brzyski *if Brzyski was approved and entered into a distributorship contract with appellant.* Respondent also agreed to help Brzyski with afternoon deliveries of the *Star* in Chillicothe until mid-May, 1973 when Brzyski's duties as a teacher were completed. In return, Brzyski would assume the balance due from respondent and his wife on the promissory note with the Chillicothe State Bank.

On Thursday, March 29, 1973, Mr. Wilbur Reagan, county circulation manager for appellant, received respondent's recommendation that appellant contract with Brzyski, effective April 1, 1973, for the distribution of newspapers in Chillicothe. Prior to this communication, nothing in the record suggests that appellant had prior knowledge that respondent would recommend anyone to assume distribution of the newspapers or that Brzyski had the interest or qualifications necessary to handle the job to appellant's satisfaction. Appellant nevertheless began inquiry as to Brzyski's qualifications and contacted a Mr. John Hack, who they were informed had employed Brzyski to deliver newspapers in Lawrence, Kansas. This reference commented favorably on Brzyski's performance.

In addition to contacting Mr. Hack, Mr. O. B. Strausser and Mr. Glen Peer, representatives of appellant met with Brzyski for the first time on or about March 29, 1973 at Brzyski's home ten miles south of Chillicothe. During the course of the meeting, the mechanics of distribution and service were discussed, as well as appellant's philosophy about delivering the papers. Brzyski testified that it became apparent to him during the course of the meeting that appellant's representatives assumed that he would move to Chillicothe if he entered a contract with appellant. Brzyski informed them that he was not interested in moving to Chillicothe and the remainder of the discussion involved Strausser and Peer telling Brzyski that "they did not feel he could service the route properly if he remained in his residence outside of Chillicothe". In his brief, respondent emphasizes the following deposition testimony of Brzyski introduced at trial:

"Question: Now, this first conversation that you had with the representatives of Star, I think you said you gained the impression from what they said first of all you testified, I believe that they told you you would be approved by the Star? Answer: I believe they did at that point, yes.

Question: But you gained the impression that it would be necessary for you to move into Chillicothe?

Answer: Yes.

Question: Now did the Star representatives tell you that?

Answer: Under oath I would have to quote somebody's words, you know. I really don't recall the exact words that they used, but something to the effect that they couldn't see how I could provide proper service to the route living where I did, and that the way they viewed it the only way the route could be properly serviced was that I lived in town. * * *

Question: But did they make it a condition that you would have to move into Chillicothe in order to enter into a contract with The Kansas City Star Company?

Answer: That was the impression that I had.

Question: That was your impression, that that was a condition?

Answer: That to get the route I would have to move to town. That was the impression that I had then.

Question: That was the impression that you had then?

Answer: Yes, that's correct."

Brzyski was not able to testify either at deposition or at trial that appellant's representatives made moving to Chillicothe a condition of approval by appellant. O. B. Strausser testified that he told Brzyski at the first meeting the following:

"I did say, naturally, that the closer you were to your work, not only The Kansas City Star but any job, the closer you are. I told him that, of course, he would have calls for missed papers that would have to be delivered. He would have calls that didn't get their paper at all, and they would have other calls, and, of course, it would be easier if he lived closer in Chillicothe, but I told him just as plain as I could tell him that we did not care—when I say we, I mean The Kansas City Star— we did not care where he lived as long as he gave service. Not only he, but anyone else, as long as they gave service it didn't matter where they lived."

There was also testimony from Wilbur Reagan that it was a policy of appellant to recommend that a carrier live in his distributorship area, but that such residence is not a compulsory requirement.

Following the first meeting with Brzyski, Reagan advised Strausser to contact Brzyski and tell him that appellant would enter into a contract with him. In a meeting with Brzyski, the next day, March 30th, 1973, Brzyski informed Strausser that he decided not to contract with appellant even though Strausser expressly told him that it was willing to enter into a contract with him. In addition to the preference of appellant that Brzyski live in Chillicothe, other considerations influenced his decision.

First, although respondent had agreed to help Brzyski deliver the afternoon papers until mid-May, 1973 when his high school teaching ended, Brzyski expressed concern over his inability to insure that respondent would fulfill this agreement. Brzyski also harbored doubts about his ability to fulfill the normal delivery of service obligations attendant to the distributorship. Thus, at trial, Brzyski testified:

"Having been involved with delivering newspapers before, you're never in a position where you always—where for a variety of reasons something wrong doesn't happen, regardless of how diligent or responsible you are, and so I was concerned that the kinds of normal problems that one encounters in that sort of an enterprise would be attributed to the fact of where I lived rather than the fact that they were just normal problems that occur and that sort of a situation."

On March 31, 1973, the delivery of newspapers by respondent ceased. On April 1,

appellant's employees began distribution in Chillicothe and continued to so distribute until May 4, 1973, when a new independent distributor began servicing that route.

Respondent was not able to pay back the amounts owed Chillicothe State Bank when demanded. As a result, the bank repossessed the truck owned by respondent, which he had pledged as security for the promissory note. The bank also recovered a judgment on the note in the sum of $24,-177.10, which respondent satisfied. Respondent brought the instant suit on the theory that appellant's actions toward Brzyski caused the latter to reject entering into a contract with respondent and that such actions constituted tortious interference with Francisco's "right to contract."

Trial commenced on October 8, 1979, after which the issue of tortious interference was submitted to the jury. The jury returned a verdict in favor of respondent for "actual damages only" in the amount of $42,327.00. On October 12, 1979, the trial court entered judgment accordingly, and on October 16, 1979, defendant timely filed a motion for judgment in accordance with its motion for a directed verdict or for a new trial. That motion was denied on January 9, 1980, and appellant filed its notice of appeal to this court on January 18, 1980.

■ Interference with contractual or business relations is a tort recognized under Missouri law. This was declared by our state Supreme Court in *Downey et al. v. United Weather Proofing*, 363 Mo. 852, 253 S.W.2d 976 (1953) which held that in order for such claim to be sustained, a plaintiff must establish five elements. Those elements are:

(a) a contract or valid business relationship or expectancy;

(b) knowledge by the defendant of the contract or relationship;

(c) intentional interference by the defendant which induces the breach of contract or relationship;

(d) the absence of justification; and

(e) resulting damages.

That the foregoing elements are still required, see *Fischer, Etc. v. Forrest T. Jones and Co.*, 586 S.W.2d 310, 315 (Mo. banc 1979); *Salomon v. Crown Life Insurance Co.*, 536 F.2d 1233, 1238 (8th Cir. 1976), cert. denied 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976); *Harber v. Ohio National Life Ins. Co.*, 390 F.Supp. 678, 683 (E.D.Mo.1974), aff'd 512 F.2d 170 (8th Cir. 1975); *Squirtco v. 7-Up Co.*, 628 F.2d 1086, 1092 (8th Cir. 1980); *M.J.S. Resources, Inc. v. Circle G. Co.*, 506 F.Supp. 341, 348 (E.D.Mo.1980).

While most decisions have considered this cause of action in relation to existing formal contracts, *Downey*, while listing the requisite elements of the tort, also pointed out that the cause of action and hence the right of recovery was not so limited. The court in *Downey* declared 253 S.W.2d at 980:

> "The right of recovery for inducing a breach of a contract is but one instance of the protection which the law affords against unjustified interference in business relations. An existing contract may be a basis for greater protection, but some protection is appropriate against unjustified interference with reasonable expectancies of commercial relations even where an existing contract is lacking. The unjustifiable character of the alleged wrongdoer's conduct and the harm caused thereby may be equally clear in both instances, but the differentiation between them relates to the scope of the privileges, or the kind and amount of interference that is justifiable in view of the differences in the facts."

For a recent reaffirmation of the above, see *Casterline v. Stuerman*, 588 S.W.2d 86, 88 (Mo.App.1979).

■ Liability under this tort cannot be predicated upon speculation, conjecture or guesswork, and no fact essential to submissibility can be inferred absent a substantial evidentiary basis. A plaintiff must generate substantial evidence supporting each and every element of this cause of action. *Tri-Continental Leasing, Co. v. Neidhardt*, 540 S.W.2d 210 (Mo.App.1976).

In determining whether or not a submissible case has been made, this court reviews the evidence most favorable to the plaintiff (Francisco), giving the plaintiff the benefit of all inferences reasonably deducible from the evidence short of making the plaintiff's case by supplying missing evidence. *Tri-Continental, supra.* While indulging an evidentiary presumption in favor of the plaintiff, this court cannot disregard the dictates of common reason, and accept as true that which, under all the facts or circumstances, cannot be true or give a plaintiff the benefit of other than reasonable inferences. *Larrea v. Ozark Water Ski Thrill Show, Inc.*, 562 S.W.2d 790 (Mo.App.1978); *Levin v. Sears, Roebuck and Co.*, 535 S.W.2d 525, 527 (Mo.App.1976).

While appellant's alleged error is predicated upon a general claim of the lack of substantial evidence, it specifically claims the lack of such evidence relative to separate and distinct elements of the tort herein. These separate and distinct elements are (1) *the intent to induce a breach* and (2) *the absence of justification.* Consideration of appellant's contention includes each of these elements separately.

### INTENT

Under the law of our state, a plaintiff bears the burden of proving that the defendant "actively and affirmatively took steps to induce the breach." *Tri-Continental* at 216. It has been declared that "this factor alone should not be sufficient to establish liability. There must be an additional showing that the defendant's affirmative conduct caused the breach—that had it not been for the defendant's acts, the contract would have been performed." *Tri-Continental* at 216.

The element of intent in such actions has been delineated by the RESTATEMENT OF TORTS 2d, § 766, Comment j (1979) as:

"*j. Intent and purpose.* The rule stated in this Section is applicable if the actor acts for the primary purpose of interfering with the performance of the contract, and also if he desires to interfere, even though he acts for some other purpose in addition. The rule is broader, however, in its application than to cases in which the defendant has acted with this purpose or desire. It applies also to intentional interference, as that term is defined in § 8A, in which the actor does not act for the purpose of interfering with the contract or desire it but knows that the interference is certain or substantially certain to occur as a result of his action. The rule applies, in other words, to an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action."

Further, in § 766, under Comment h, the following is found:

"The essential thing is the intent to cause the result. If the actor does not have this intent, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other."

Restatement of Torts 2d, § 8A (1965) reads:

"8A. Intent

The word 'intent' is used throughout the Restatement of this Subject to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it."

In addition to the burden of proof required of a plaintiff as prescribed in *Tri-Continental, supra*, it has been declared in *Gerstner Electric, Inc. v. American Insurance Company*, 520 F.2d 790, 794 (8th Cir. 1975):

"*To recover in Missouri on a claim for wrongful interference with a contract by inducing its breach, the wrongful act must be intentionally done. Beggs v. Universal C. I. T. Credit Corp.*, 409 S.W.2d 719, 722 (Mo.1966). *There must be proof that the defendant not only intended to commit an act which is ascertained to be wrongful but also that he knew it was wrongful at the time he did it.*" *(emphasis added)*

It is against the foregoing principles that the instant record is viewed regarding the element of intent.

The parties herein do not contend, nor does the evidence tend to support any claim, that appellant engaged in any inherently wrongful activity in its discussions with respondent's prospective purchaser, Henry Brzyski. Stated another way, there is no evidence of appellant's using force, threats, deceit, defamation or misrepresentation. Nor is there evidence of the application of economic pressure or unconscionable bargaining on the part of appellant.

Respondent suggests to this court two "motives" which establish the tortious interference by appellant. First, respondent suggests the unsatisfactory performance of respondent as a carrier, which gave rise to the agreement to extend the November 29, 1972 cancellation referred to above. Aside from the total lack of evidence to support this "motive", it is most difficult for this court to perceive how the past performance of respondent could logically serve as a basis to prevent the transfer of the route to a third party, since a transfer would have not only relieved respondent of any further responsibility for the route, but at the same time, would have removed the very problem (that is, respondent's unsatisfactory performance) which respondent contends serves as a motive for interference. There is no evidence on the record to support this contention, and if left to stand solely as a mere suggestion, this "motive", on its face, is illogical and contrary to common sense.

An alternative "motive" argued by respondent is the desire expressed by appellant to change its carrier distribution system by adopting the *option* contract. The record fails to explain how appellant would financially benefit from such a change. Respondent argues that at the time of appellant's tortious conduct, it was changing "its philosophy with respect to carrier relationship. The first step in that attempted change-over was to pick up as many routes as it could from carriers who had abandoned their routes. That first step utilized the option contract." The problem with

this argument is that there is no evidence in the instant proceedings to support it. The only evidence that an *option* contract was entered into by appellant was the contract executed effective May 1, 1973, which was more than a month after the effective termination date of respondent's contract and subsequent to a month's service of the route by appellant's direct employees. There is no evidence which shows that the *option* contract or appellant's "desire" to enter into such contract was in any way related to the relationship between respondent and appellant and/or any of the contacts between respondent and Brzyski. The obvious point is that there is no evidence to support respondent's argument that appellant's "desire" for option contracts was a motive for appellant's alleged tortious interference of contract between respondent and Brzyski. This "motive" fails because there is no evidence that it served as a wrongful act, or that appellant, by the desire to enter into *option* contracts, intended for such contracts to be used to produce a breach of contract between respondent and Brzyski. Moreover, there is no evidence to show that *option* contracts were ever discussed between appellant and Brzyski.

Appellant and a Marvin Christie discussed Christie's takeover of the route on April 9th or 10th, 1973 and option contracts were discussed. This followed appellant's meeting with Brzyski by at least ten or eleven days. Christie took over the route May 1, 1973. There is no evidence to support respondent's contention that appellant had chosen Christie under an *option* contract prior to appellant's meetings with Brzyski.

In conjunction with respondent's argument on this point, it is further argued that appellants failed to investigate one Ken Walters with whom respondent had discussed the route. Respondent argues that this amounted to evidence of intent to interfere. This contention also fails as there is no evidence that appellant knew of any connection between respondent and Walters at the time of the "Brzyski" meetings. The record further suggests that Walters did

not initiate inquiry about the route until mid to late April, 1973, which was subsequent to the date the agreement between respondent and Brzyski was terminated.

At this point, certain conclusions can be reached. The evidence does not support and the parties do not contend any wrongdoing (i.e., force, duress, etc.) by appellant. Secondly, the evidence does not support respondent's contention that appellant's desire to enter into *option* contracts served as a "motive" and thus established the requisite intent. Thirdly, the evidence does not support respondent's further contention that the failure to investigate Walters was evidence of appellant's intent to breach respondent's agreement with Brzyski. Finally, neither the evidence nor logic supports respondent's contention that respondent's unsatisfactory performance, which led to an extension of the contract between appellant and respondent, was evidence of appellant's intent to breach respondent's agreement with Brzyski.

Having considered the above factors, there remains the task of answering the following questions: Did appellant make Brzyski's moving to Chillicothe a condition of obtaining the route? If such condition was imposed, was it imposed and did it serve as appellant's intent to cause a breach of the agreement between respondent and Brzyski? It is respondent's position that both questions must be answered affirmatively. The strongest evidence to support respondent's position is the deposition testimony (read at trial) of Brzyski. Brzyski, as can be observed from the facts above, testified at the first meeting with appellant's representatives that he had the "impression" that moving to Chillicothe was a condition of his obtaining the route. At trial, Brzyski refused to testify that appellant's representatives made his moving to Chillicothe a condition of his obtaining the route. In addition, the evidence goes unchallenged that the next day (following the initial meeting between Brzyski and appellant's representatives) a second meeting occurred, where appellant's representatives advised Brzyski of appellant's willingness to contract with Brzyski and of the expressed assurance that Brzyski's moving to Chillicothe was not required.

Brzyski's testimony also contains reference to other factors which describe Brzyski's attitude toward taking over the route. Brzyski at the time was a public school teacher. He had given notice of his termination at the end of the school year. Because of his duties at school, he did not depart the school in the afternoon until a time after delivery of the evening papers to the carrier drop point. The evidence reveals that respondent had told Brzyski that he (respondent) would help Brzyski deliver the evening papers until mid-May, 1973, when the school year would have ended. Brzyski expressed some reservations about this arrangement, and testified:

"Having been involved with delivering newspapers before, you're never in a position where you always—where for a variety of reasons something wrong doesn't happen, regardless of how diligent or responsible you are, and so I was concerned that the kinds of normal problems that one encounters in that sort of an enterprise would be attributed to the fact of where I lived rather than the fact that they were just normal problems that occur and that sort of situation."

After being questioned relative to respondent's offer to assist Brzyski until the end of the school year, Brzyski testified:

"Yes. I was obligated to finish out the school year with the school, which would create some delivery problems, and Mr. Francisco and I had discussed his staying to help me out until I was out of school."

and further:

"I think any time you have to depend on somebody that you don't directly control to do something you worry about it. I wouldn't make it any more a general concern that anybody would have about somebody doing something that you really had no control over."

Brzyski's testimony can be, at best, summarized as equivocal. In one instance, he testified that he and respondent had a contract and if it had not been for the "impres-

sion" that he had to move to Chillicothe, he would have consummated the contract. In other portions of his testimony, Brzyski testified that he could not say if appellant's representatives directly told him that the move was required, but also revealed personal reservations concerning possible management problems with the route. He further testified: "I can't say as far as a contract that they said if I didn't go to Chillicothe they couldn't make a contract with me. I can't say that they said they wouldn't make a contract ... I never had the impression that The Star would require that I move to town, only that they took a dim view of my not doing so ... The gentlemen from The Star alleviated any impression that The Star would require a move on my part ... I was left with the clear impression that if I didn't move to town, I probably would not be approved by The Star."

Concerning the first question propounded above, it must be concluded the only evidence that appellant made Brzyski's moving to Chillicothe a condition of obtaining the contract was Brzyski's testimony that he had the "impression" such was a condition. There is no direct evidence that appellant's representatives expressly required Brzyski to move. In addition, the evidence reveals that appellant's representatives positively assured Brzyski that no move was necessary. It cannot be concluded that the equivocal testimony that led to Brzyski's "impression" was substantial evidence to establish that appellant made Brzyski's moving to Chillicothe a condition of obtaining the route. The first question above is answered negatively.

■ Aside from the equivocal nature of Brzyski's testimony, the further fact remains that there is no evidence in the record that if Brzyski's moving was a condition of obtaining the route, it was imposed by appellant with the intention of producing a breach of the agreement between Brzyski and respondent. Appellant did possess an interest in the adequacy of service of the route, and was concerned that Brzyski would be able to meet his responsibilities as

a carrier. Respondent urges this court to construe that interest and concern as an intent to interfere in the contract between Brzyski and respondent. There is no evidence which would support a finding that appellant knew Brzyski was unwilling to move to Chillicothe or that such a condition (if one were in fact imposed) would cause Brzyski to "breach" his agreement with respondent. The lack of such evidence fails to meet the requirements for recovery on a claim for tortious interference. *Gerstner, supra.* The entire question of Brzyski's moving to Chillicothe arose during the first meeting between Brzyski and appellant's representatives, from which Brzyski gathered the "impression" that such move was necessary. The evidence, when seen in toto, shows Brzyski equivocating on whether a contract would have been entered into; his denial that appellant's representatives directly demanded he move; a discussion of practical management problems that could possibly arise as a result of his living some 8–10 miles from the route; the confirmation by both Brzyski and appellant's representatives that moving to Chillicothe was not required (the second meeting); and the direct offer by appellant through its representatives to enter into a contract with Brzyski. This evidence forces the conclusion that respondent did not make a submissible case upon the requisite element of intent.

### ABSENCE OF JUSTIFICATION

In addition to the foregoing discussion, the element of justification contained within appellant's allegations of error must be discussed.

■ In Missouri, absence of justification is an element of the claim of wrongful or tortious interference of contract and a plaintiff carries the burden of proof on this issue, *Fischer* and *Gertsner, supra; Cady v. Hartford Accident and Indemnity Co.,* 439 S.W.2d 483, 485 (Mo.1969) and *C. and M. Developers, Inc. v. Berbiglia,* 585 S.W.2d 176, 184 (Mo.App.1979). Our state is among those jurisdictions which includes, as a requisite part of the cause of action for such

claims, that plaintiff plead and prove the acts of a defendant inducing or causing a breach "be without justification", *Pillow v. General American Life Insurance Co.*, 564 S.W.2d 276, 280 (Mo.App.1978).

As pointed out above, there is no evidence or any contention by the parties that any of appellant's actions were inherently wrongful. In the absence of such inherent wrongful actions, the question which arises is: Did respondent carry his burden of proof regarding absence of justification?

It is undisputed that Brzyski had to obtain the written consent of appellant before he could obtain the route under contract with appellant. The answer to the question relative to respondent's burden of proof turns upon the discussion between Brzyski and appellant's representatives, and whether those representatives were related to and a part of appellant's legitimate economic interests. Our courts have recognized that where one has a bona fide legal economic interest to protect, that party is privileged to prevent performance of a contract which threatens that bona fide legal economic interest, *Pillow; C. and M. Developers*; and *Salomon, supra.* See also *Francis Chev. Co. v. General Motors Corp.*, 602 F.2d 227 (8th Cir. 1979); *Pierce Ford Sales, Inc. v. Ford Motor Co.*, 299 F.2d 425 (2nd Cir. 1962); and *Walner v. Baskin-Robbins Ice Cream Co.*, 514 F.Supp. 1028 (N.D.Texas 1981). That proof of such element of this tort claim cannot rest upon "speculation and conjecture" see *C. and M. Developers, supra.* The exercise of the "lawful right to negotiation" is a protected activity as long as the negotiations are not inherently improper. *International Plastics, Inc. v. Monsanto*, 433 S.W.2d 291, 296 (Mo.banc 1968).

Appellant's discussions with Brzyski included its interest in insuring distribution of its papers by responsible, competent and honest carriers. Appellant's representatives manifested concern about Brzyski's ability to adequately service the route because Brzyski lived some 8–10 miles south of Chillicothe. Respondent seizes on a statement by appellant's representatives, to the effect that it was not the policy of the appellant to require carriers to live within their route. If Brzyski arrived at this impression, it was contrary to the customary practice of appellant, and respondent argues such supports an absence of justification. At most, what can be concluded from such evidence is that if such residency requirement was in fact imposed, it was contrary to the past practice of appellant. Such evidence proves that it was neither wrongful nor without justification, particularly when viewed in light of evidence of respondent's problems with service and delivery and appellant's bona fide legal economic interest pertaining to proper delivery and service within the route. The foregoing must also be viewed in the context of evidence which revealed, at the second meeting between Brzyski and appellant's representatives, direct confirmation to Brzyski that he need not move, along with appellant's direct offer to contract with Brzyski.

In summary, it is concluded that appellant had a protectable, bona fide, legal, economic interest concerning delivery of its newspapers and proper service of the route. Further, the evidence reveals that discussions with Brzyski depicted a concern by appellant over the adverse effect living some 8–10 miles from the route might have on proper delivery of newspapers and service of the route. In addition, while it has been found that Brzyski's "impression" is not substantial evidence to support a finding that appellant made demand that Brzyski move, and that the evidence was not substantial to support a finding that such alleged demand serve as the intent to wrongfully interfere, it must be further concluded that if such demand had in fact been supported by substantial evidence (and absent a showing that such demand was intended to breach the contract), such demand would not, standing alone, support a finding of a lack of justification. This conclusion must be reached because appellant's bona fide legal economic interests are obviously interrelated with the ability and competency of its carriers to deliver newspapers and to service a route. The location of

Brzyski's residence was directly related (because of the 8–10 mile distance) to the delivery of newspapers and service of the route. This delivery and service are well within the parameters of the bona fide legal economic interests of appellant. It cannot be held that appellant (assuming a demand upon Brzyski that he move had been supported by substantial evidence) acted without justification. The evidence fails to support a finding of an absence of justification which is a mandatory element of a claim for tortious interference of contracts and an element which must be pleaded and proven by the respondent.

Based upon the record herein, this court finds a lack of substantial evidence that appellant made demand upon Brzyski to move as a condition of obtaining the distribution contract; that such demand was at best manifested by Brzyski's "impression"; and that such "demand" was not intended to cause a breach of contract between respondent and Brzyski. This court further finds a lack of substantial evidence to support respondent's claim of absence of justification because the evidence reveals that appellant's discussions with Brzyski relative to the latter's residence were within the scope of appellant's bona fide legal economic interests and hence were justified. Respondent's contentions regarding intent and absence of justification were negated by the unchallenged testimony of appellant's willingness and offer to enter into a contract with Brzyski. The trial court erred in its failure to direct a verdict for appellants.

Upon such finding, appellant's alleged error is found to be well taken and is sustained to its favor. The judgment, for the reasons set forth herein, is reversed.

All concur.