MINNESOTA MINING & MANUFACTURING COMPANY, a Corporation, Plaintiff-Appellant-Respondent,

v.

Ken WILLIAMSON, Defendant-Respondent-Appellant.

Nos. 13273, 13279.

Missouri Court of Appeals, Southern District, Division One.

July 31, 1984.

Motion for Rehearing or to Transfer Denied Aug. 21, 1984.

Application to Transfer Denied Oct. 9, 1984.

John T. Martin, Sam L. Colville, Dennis R. Dow, Kansas City, Donald R. Duncan, Springfield, for plaintiff-appellant-respondent.

Donald E. Bonacker, Springfield, for defendant-respondent-appellant.

FLANIGAN, Presiding Judge.

Plaintiff Minnesota Mining & Manufacturing Company, a corporation, (3M), a

manufacturer of automotive products, sued its former "Automotive Redistributor," defendant Ken Williamson, for the balance of an unpaid account. Williamson filed a counterclaim seeking damages by reason of 3M's intentional interference with "an active business contractual relationship" which Williamson had with Sid Greenburg Sales Company of St. Louis, Missouri (Greenburg). The jury awarded 3M $23,-961.45 on the petition and awarded Williamson $60,000 actual damages and $200,000 punitive damages on the counterclaim. Both sides appeal. 3M's appeal will be considered first.

■ Under Missouri law the elements of a cause of action for tortious interference with business relations, as stated in *Fischer, Etc. v. Forrest T. Jones & Co.*, 586 S.W.2d 310, 315 (Mo. banc 1979), are:

"(1) A contract or a valid business relationship or expectancy (not necessarily a contract);

(2) Defendant's knowledge of the contract or relationship;

(3) Intentional interference by the defendant inducing or causing a breach of the contract or relationship;

(4) The absence of justification; and

(5) Damages resulting from defendant's conduct."

3M asserts that the evidence is insufficient to support the verdict on the counterclaim because there was a failure of proof with respect to elements 3, 4, and 5. For the reasons which follow, this court holds that there was a failure of proof with respect to element (4), the absence of justification, and it is unnecessary to consider whether there was a similar failure with respect to elements (3) or (5).

■ In determining whether Williamson made a submissible case on his counterclaim, this court must view the evidence in the light most favorable to Williamson and give him the benefit of all inferences which may reasonably be drawn and which support the counterclaim. *Smith v. Allied Supermarkets, Inc.*, 524 S.W.2d 848, 849[1] (Mo. banc 1975). Williamson had the burden to produce substantial evidence supporting every element of his cause of action. No fact essential to submissibility may be inferred in the absence of a substantial evidentiary basis. *Tri-Continental Leasing Co. v. Neidhardt*, 540 S.W.2d 210, 211 (Mo.App.1976). There are few, if any, material conflicts in the evidence concerning the counterclaim, and most of it was introduced by Williamson.

In order to comply with anti-trust laws, including the Robinson-Patman Antidiscrimination Act, 15 U.S.C.A. § 13 et seq., 3M employs a distribution system which involves "functional pricing" of its products. 3M sells its products for the same price to all distributors who perform the same function in the distribution network. The 3M products involved in this litigation are ordinarily used in the maintenance, repair, or refinishing of automobiles. The ultimate consumer of these products is usually an automobile body shop.

One method of distribution is for 3M to sell the goods to a warehouse distributor who resells to a jobber who resells to a body shop. The warehouse distributor pays 3M 90 percent of the price which 3M would charge the jobber if 3M by-passed the warehouse distributor and sold directly to the jobber. Such by-passing is permissible.

Williamson was not a warehouse distributor but was an "automotive redistributor," a hybrid category acting at times as a warehouse distributor and at times as a jobber. Williamson performed the function of a warehouse distributor when he sold to jobbers. Unlike a warehouse distributor, however, Williamson was at liberty to sell directly to the body shops, by-passing a jobber. Thus, for Williamson, two possible methods of distribution existed; the two-step method (3M sells the goods to Williamson who resells to a body shop) and the three-step method (3M sells the goods to Williamson who resells to a jobber who resells to a body shop). In the three-step method, Williamson was entitled to receive a 10 percent discount from 3M. In the

two-step method, Williamson received no discount.

Although a warehouse distributor and Williamson each received a 10 percent discount on their sales to jobbers, there was a difference in the way 3M gave that discount. Since the warehouse distributor sold only to jobbers, 3M granted him initially a 10 percent discount by charging him 90 percent of the price which 3M charged a jobber to whom 3M made a direct sale. On the other hand, since Williamson sold both to jobbers and to body shops, 3M would charge Williamson, on all of the original billings, the full price of the goods. Williamson would then sell a portion of the goods to jobbers and a portion to body shops. Williamson would send monthly reports to 3M of his sales to jobbers and 3M would give him a 10 percent discount on those sales.

On February 20, 1974, 3M and Williamson, who was doing business as an individual under the fictitious name of "Central Warehouse Distributors," entered into a written "Automotive Redistributor's Agreement," supplemented by a "Statement of Policy for Automotive Trades Redistributors." Taken together, those documents included the following, somewhat paraphrased, provisions:

1. Williamson was appointed an automotive redistributor. An automotive redistributor maintains an adequate warehouse inventory of goods and delivery facilities "to promptly and adequately service jobbers from his stock." The automotive redistributor ships to, invoices, and carries credit of his jobber accounts. 3M has the privilege to inspect the automotive redistributor's records to confirm the accuracy of the monthly reports reflecting sales to jobbers on which the discount is allowed.

2. A jobber is one who is customarily engaged in the sale of products to body shops. Neither the automotive redistributor nor the jobber to whom the redistributor sells 3M goods has more than a minimal ownership interest in the other.

3. Williamson acts pursuant to the 3M merchandising plan (the distribution system, including functional pricing and the two-step and three-step methods previously outlined).

4. Williamson will submit monthly reports to 3M showing all resales by Williamson to jobbers.

5. All shipments of goods, sold by 3M to Williamson, shall be made to the warehouse of Williamson.

6. Conditions were set forth concerning the return by Williamson to 3M of goods which Williamson no longer wanted. The conditions varied, depending upon whether the unwanted stock of goods was created by 3M's error or by Williamson's error, or whether the goods were "slow moving" or were "new products." Depending upon the situation, Williamson might return the goods at 100 percent credit or incur a restocking charge of 15 percent. In some situations 3M would pay the cost of return and in others Williamson would bear that cost.

7. "3M has no exclusive redistribution arrangements." Williamson may sell 3M products to any customer anywhere and 3M has no control over Williamson's prices. The agreement was terminable, at the option of Williamson or 3M, upon the giving of written notice.

Although Williamson conducted his redistributorship both in Springfield and at a nearby rural location, his operation was essentially Springfield-based. The Williamson-Greenburg relationship, the subject of the counterclaim, commenced in the fall of 1978. Greenburg was a jobber who for years had been dealing in 3M goods. Greenburg's place of business was in the St. Louis area, only two or three miles from 3M's St. Louis warehouse. Prior to his dealings with Williamson, Greenburg had purchased 3M products from Missouri Glass Distributors, a warehouse distributor for 3M. After Missouri Glass went out of business, conversations took place among 3M, Williamson, and Greenburg with regard to Greenburg buying 3M products through Williamson.

On November 15, 1978, C.P. Crockett, 3M's area sales manager in St. Louis, wrote a letter to Williamson outlining the procedure for the handling of sales of 3M products through Williamson to Greenburg. Paraphrased, the letter said: Williamson would receive an order from Greenburg and would transmit same to John Powell, a 3M employee in St. Louis. The Williamson order would list sales to Greenburg only—no other customer—and would be in minimum quantities of 75 cases. The Williamson order could be preceded by a telephone call to Powell, with three days' notice recommended. After 3M had the order prepared for shipment, 3M "can hold for will-call and [Powell] will call [Greenburg] indicating the order is ready for pickup." 3M would bill Williamson for the goods and Greenburg would have the authority to pick up the goods at the 3M St. Louis warehouse.

Although occasionally Williamson would pick up a Greenburg order at the 3M facility in St. Louis and deliver it to Greenburg, usually Greenburg himself would take delivery at the 3M dock. On occasion Williamson would deliver 3M goods to Greenburg in the 3M parking lot. At times Greenburg initiated the order to Powell. After the order was assembled, Powell would telephone Greenburg indicating the order was ready for pickup, either by Williamson or Greenburg. This procedure was called a "will-call," or a "drop-shipment," or "drop-ship," as distinguished from the normal situation where 3M shipped to the redistributor's warehouse. Williamson was billed by and paid 3M. Greenburg was billed by and paid Williamson.

The arrangement between Williamson and Greenburg was that they would split the 10 percent discount to which Williamson was entitled on a Williamson-jobber sale. Williamson sold goods to Greenburg at 95 percent of the price Williamson charged other jobbers. The Williamson-Greenburg situation was described as "unique" in that Greenburg, a St. Louis jobber, was served by a redistributor "so far away."

The Williamson-Greenburg relationship continued, in the manner outlined by the letter of November 15, 1978, for several months. Williamson testified that he "did $48,000 business with Greenburg" on which "there was a profit of 5 percent."

The focal point of the counterclaim is a letter of July 20, 1979, from 3M's area sales manager Crockett to Williamson. That letter, introduced into evidence by Williamson, reads:

"Dear Ken:

I attempted to reach you today, July 17, and apparently your daughter who answered the phone indicated that you were out of town. I was sorry that I had missed you because I have some circumstances that have developed that I would have rather talked to you about than put in a letter.

There has been an apparent policing of drop-ships to customers of redistributors throughout the country, and as you might suspect, the Greenburg-[Williamson] connection popped up during the process. We must immediately terminate the arrangement wherein Greenburg will calls orders that are billed through you, Ken. This is considered a drop-ship, and as a result is not qualifiable for redistribution commission.

The option, of course, would be to continue to sell [Greenburg] as a jobber customer of yours, but you must take delivery of the goods in Springfield, and then re-ship back to St. Louis. In other words, we must simply eliminate the present procedure if you are to report him for rebate.

As you are well aware, [Greenburg's] involvement in our specialty program here in St. Louis is very important to all of us, and if you and [Greenburg] can't make some arrangement based on the changing circumstances, I, of course, will honor orders for [Greenburg] on a direct basis at ATD orange sheet prices. I, of course, want to be certain of a continuing source of supply for [Greenburg] based on his activity, and support that he has given to us.

Again, I am sorry the way that this has turned out—it is simply enforcement of

standard policy, and we must immediately stop the previous will-call arrangement with Mr. Greenburg. I know that I can count on your understanding, and cooperation in this matter.

> Sincerely,
> C.P. Crockett
> Area Sales Manager
> Automotive Trades Division"

Williamson testified that after he received that letter, "I was permitted to go to St. Louis and pick up merchandise on the dock and carry it to Greenburg. That was not terminated by the letter—'will-call' was not terminated—but I could not afford to do business with Greenburg because the costs were too high. I could not make it on 5 percent. I had to terminate my relationship with Greenburg. I knew how the marketing system worked. I knew that the 10 percent was allowed as a functional discount, that function being sales and warehousing. I had no overhead at all on the sales to Greenburg. I was getting 10 percent but I allowed Greenburg half of it. I was getting 5 percent on 3M sales to Greenburg for essentially doing nothing. When I occasionally 'will-called it myself' I chose to do that and did not have to. After the letter of July 20, 1979, I could have continued to sell Greenburg by having the goods shipped to Springfield and then shipping them back or going to St. Louis and taking it to Greenburg. If I had done either of those things I would have still gotten the 10 percent. I was kind of boxed in because I had given Greenburg this price of 5 percent less than the 3M catalog price and I did not want to continue that profit margin. I could have sold Greenburg at a price higher than catalog minus 5 percent but I did not try. Greenburg was not required to buy anything through me nor did Greenburg agree with me to buy a certain quantity or for a certain time. Greenburg was not required to do anything and Greenburg and I could have ended our relationship at will." The evidence showed that Williamson did some business with Greenburg after the letter of July 20, 1979, was received and implemented.

One of 3M's witnesses was John J. Ursu, assistant general counsel for 3M. During examination by counsel for Williamson, Ursu testified that he was an anti-trust lawyer and had taught anti-trust law for four years at a law school. He testified that the 3M market distribution system, functional pricing and discount allowances were devised to comply with federal regulations and price discrimination laws.

Ursu testified that the 3M distribution facilities in St. Louis "are not built to handle any significant will-call volume." He pointed out that under the Williamson-3M agreement of February 20, 1974, and as a basis for the allowance of a 10 percent discount on Williamson's sales to jobbers, Williamson was to maintain an adequate warehouse inventory and Williamson was to ship 3M goods to his jobbers. Ursu also stated that the agreement provided that all shipments of goods, sold by 3M to Williamson, were to be made to Williamson's warehouse.

Ursu testified that the letter of July 20, 1979, "had nothing to do" with the 10 percent but that Williamson could still qualify for that discount on Greenburg sales so long as Williamson, rather than Greenburg, picked up the goods or had them first shipped to Springfield. The letter meant that 3M would not pay Williamson 10 percent for any goods which Williamson did not physically redistribute to the jobber. Greenburg could continue to "will-call" the goods but Williamson would not get the 10 percent on that transaction. Ursu testified that 3M did not terminate its relationship with Williamson but that Williamson told Ursu in 1979 that Williamson had "taken on some other lines" and that he was through doing business with 3M.

It is clear that there was a business relationship between Williamson and Greenburg and that 3M had knowledge of that relationship and played a significant role in devising its system of operation. It is also clear that Greenburg, a jobber, was, by reason of the unique operation, receiving goods at 95 percent of the price available to other jobbers. Ursu, on cross-ex-

amination by Williamson's counsel, testified that "federal law creates legal consequences for manufacturers who give discriminatory prices and for buyers who knowingly receive a discriminatory price."

Citing federal cases, 3M argues that the 3M-Williamson-Greenburg "special delivery arrangements" were "a possible violation" of the Robinson-Patman Act. Williamson does not take issue with that assertion. 3M's letter of July 20, 1979, ended the practice because of the "apparent policing of drop-ships," a reference to federal investigation of such practices.

Cases discussing the element of "the absence of justification," and finding it unproven in various factual situations, include *Francisco v. Kansas City Star Co.*, 629 S.W.2d 524 (Mo.App.1981); *C & M Developers, Inc. v. Berbiglia*, 585 S.W.2d 176 (Mo.App.1979); *Salomon v. Crown Life Ins. Co.*, 536 F.2d 1233 (8th Cir.1976); and *Gerstner Electric, Inc. v. American Insurance Company*, 520 F.2d 790 (8th Cir. 1975). The two federal cases are based on Missouri law. As pointed out in *C & M Developers, Inc.*, although a majority of jurisdictions take the position that a claim of absence of justification is in the nature of an affirmative defense, under Missouri law absence of justification is an element of the cause of action and "is equatable with malicious interference." In *Francisco* the court stated that conduct "within the scope of a bona fide legal economic interest" was justified.

In *Salomon* the court said: "Justification for intentional interference such as is alleged in this case can be provided through proof that the efforts were under-

taken to protect a valid economic interest." The court quoted with approval the following language from the Restatement of Torts:

"The issue in each case is whether the actor's conduct is justifiable under the circumstances; whether, upon a consideration of the relative significance of the factors involved, his conduct should be permitted despite its expected effect of harm to another."

In *Gerstner* the court found there was a failure of proof of absence of justification where the defendant's conduct was "wholly justified" by defendant's "concern respecting its exposure to a substantial loss."

■ There was no showing that 3M, by actions or words directed toward *Greenburg*,[1] induced or caused a breach of the Williamson-Greenburg relationship. What 3M did, by the July 20, 1979 letter, was to stop the allowance of a possibly illegal discount to Williamson with respect to goods which Greenburg himself picked up. Williamson failed to prove "the absence of justification" for the stopping of that practice. The record strongly suggests, and indeed it may demonstrate, the absence of justification for the commencement of the practice rather than the termination of it.

After the July 20, 1979, letter Williamson was still free to sell to Greenburg at any price and Williamson would receive the 10 percent discount on sales to Greenburg if, as in the case of Williamson's sales to other jobbers, the goods were shipped to Williamson at Springfield or if Williamson picked up the goods at the 3M dock. The sweetheart arrangement among Williamson,

---

**1.** Williamson's verdict-directing instruction on the counterclaim required the jury to find, among other things, that 3M caused *Williamson* to terminate his business relationship with Greenburg. 3M argues that the instruction was erroneous for not requiring the finding that 3M caused *Greenburg* to terminate his business relationship with Williamson. The validity of that argument need not be determined in view of this court's holding that Williamson failed to prove the element of "absence of justification." See, however, Restatement of Torts, 2d, § 766 Intentional Interference with Performance of

Contract by Third Person, and § 766A Intentional Interference with Another's Performance of His Own Contract. A comment under the latter section reads:

"This Section is concerned only with the actor's intentional interference with the plaintiff's performance of his own contract, either by preventing that performance or making it more expensive or burdensome. It is to be contrasted with § 766, which states the rule for the actor's intentional interference with a third person's performance of his existing contract with the plaintiff."

Greenburg, and 3M, which had given Greenburg a competitive advantage over other jobbers and Williamson a similar advantage over other redistributors, was brought to an end.

3M's conduct in eliminating the 10 percent discount on orders picked up by Greenburg had the effect, of course, of increasing Williamson's costs in selling to Greenburg. It is arguable that such conduct alone should not satisfy element (3) set forth in the second paragraph of this opinion. If it did, any price increase by a manufacturer to a wholesaler, which might chill a resale to a retailer or consumer, might give rise to a claim of tortious interference with business relations. That issue, if such it be, need not be decided because this court holds that there was a failure of proof with respect to element (4), "the absence of justification."

Williamson's brief argues that three items of his evidence proved "the absence of justification". These items were adduced in support of Williamson's defense to the petition or in support of a separate cause of action, set forth ·in the counterclaim, which Williamson abandoned.

■ First, Williamson points to evidence that 3M refused to pay him a 10 percent discount on sales which Williamson made to Pow-R Chemical Company which in turn sold to a body shop in Tulsa. The fact is that Williamson himself did business under the fictitious name of Pow-R Chemical Company. Williamson *was* Pow-R Chemical Company. These sales were sales by the two-step method on which no discount was due. It is clear that this proof had nothing to do with the Williamson-Greenburg relationship.

Second, Williamson points to a disagreement he had with 3M concerning $4,000 worth of striping tape which had been ordered for delivery to Gene Bond, a body shop in the Springfield area. The evidence conflicted on whether Williamson or a 3M sales representative had ordered the shipment. That evidence has nothing to do with the Williamson-Greenburg relationship.

■ Third, Williamson points to evidence that in October 1981 3M appointed a corporation, in which Greenburg had some interest of undisclosed extent, to act as warehouse distributor. This court has reviewed the particulars of that transaction, remote in time to the 1979 events surrounding the counterclaim, and that evidence, of questionable relevance, is insufficient to constitute proof of absence of justification for the termination of the 1979 sweetheart arrangement.

It was not the burden of 3M to justify its conduct in sending and implementing the July 20, 1979 letter. It was Williamson's burden to prove such conduct was unjustified and he failed to do so. The evidence is insufficient to support the verdict on the counterclaim.

On his appeal Williamson's first point is that the trial court erred in receiving into evidence plaintiff's Exhibit 7 which consisted of various invoices of shipments of goods to Williamson, together with a summary sheet showing the balance due on the account to be $23,961.45. Williamson asserts that Exhibit 7 was not sufficiently identified under the Business Records Act.

■ The trial court, who received extensive evidence concerning Exhibit 7 and the manner in which it was prepared, had considerable discretion in ruling on its admissibility. This court has reviewed that evidence and finds no abuse of discretion. Moreover Exhibit 7 was merely cumulative. Williamson himself offered an exhibit, defendant's Exhibit R, which showed a breakdown, by invoice numbers and charges, of Williamson's account with 3M. Exhibit R shows that the unpaid balance of the account was $23,961.45, the amount of the verdict on the petition. Williamson's first point has no merit.

■ Williamson's second point is that the trial court erred in failing to direct a verdict in his favor on the petition for the reason that "no substantial evidence was produced showing Williamson requested any of the items alleged in the unpaid invoices." A sufficient answer to that con-

tention is that it is factually unsound. Williamson himself testified, on cross-examination, that he had examined Exhibit 7 during the trial, that none of the invoices attached to Exhibit 7 had been paid, that he had received each of the invoices, that the invoices showed what had been *ordered*, the price charged per unit and the total, and that all of the merchandise shown on the invoices had been delivered to him. Williamson's second point has no merit.

That portion of the judgment awarding 3M $23,961.45 on the petition is affirmed.

That portion of the judgment awarding Williamson $60,000 actual damages and $200,000 punitive damages is reversed.

GREENE, C.J., and TITUS and CROW, JJ., concur.