Robert O. HILL, Respondent,

v.

The KANSAS CITY STAR
COMPANY, Appellant.

No. WD 37436.

Missouri Court of Appeals,
Western District.

Sept. 2, 1986.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Nov. 4, 1986.

Application to Transfer Denied
Dec. 16, 1986.

John T. Martin, Sam L. Colville, Dennis
R. Dow, Shook, Hardy & Bacon, Kansas
City, for appellant.

William M. Austin, Sheridan Morgan,
Kansas City, for respondent.

Before TURNAGE, P.J., and SHAN-
GLER and KENNEDY, JJ.

TURNAGE, Presiding Judge.

Robert O. Hill filed suit against the Kan-
sas City Star Company alleging tortious
interference with contracts between Hill
and E.J. Carpenter, Sally Trout and Marion
O'Brien, respectively. The court entered
judgment on jury verdicts in favor of Hill
on each of the three counts. The jury
awarded Hill $32,000 in actual damages for
interference with the Carpenter contract,
$27,000 in actual damages for interference
with the Trout contract, and $25,000 in
actual damages for interference with the
O'Brien contract. The jury also awarded
$100,000 in punitive damages on each of
the three counts. The Star contends Hill
failed to make a submissible case on any
count because of the failure to prove ab-
sence of justification. Reversed.

In January of 1980 the Kansas City Star
Company published two newspapers, the
Kansas City Star and the Kansas City
Times. The company had contracts with a
number of independent contractors for the
delivery of the newspapers to residences
throughout the Kansas City area. The in-
dependent contractor purchased newspa-
pers from the Star and was responsible for
the delivery of the papers to each subscrib-
er in a satisfactory manner. The indepen-

dent contractor was responsible for collecting the subscription fee from the subscriber and for supplying all necessary equipment and manpower for the delivery of the newspaper.

In addition to residential delivery by independent contractors, the papers were also available through vending machines owned and maintained by independent contractors. The vending machines were of the type commonly seen in most cities, in which the newspapers are stacked in a machine equipped with a door that can be opened after coins are inserted in a slot.

Shortly before January 1980 the Star believed that it could increase its sales of newspapers by placing additional vending machines around the city. The Star would own, maintain, and stock the additional machines. Some of the machines owned by the Star were placed in locations where they competed with machines owned by independent contractors. Soon after the Star placed its vending machines in service there was a rash of vandalism to the machines. The vandals tampered with the doors on the machines so that the door would not open, or so that the door would open without the insertion of coins.

In January of 1980 Robert O. Hill was an independent contractor with the Star and owned his own route on which he delivered newspapers. In addition, Hill leased a route from E.J. Carpenter, who had a contract with the Star. Hill delivered the newspapers on the Carpenter route, paid Carpenter 10.5 cents per subscriber per week, collected all of the subscription fees, and paid all of his expenses for delivery. In addition, Hill also had an agreement with Sally Trout, who had a contract with the Star, by which Hill delivered newspapers on the Trout route. Hill paid Trout $200 per month, collected all of the subscription fees, and paid all of the delivery expenses.

After an outbreak of vandalism on the Star-owned machines, the Star decided to investigate in order to learn who was responsible. The Star hired the Kansas City Bureau of Investigation to find the answer.

It was decided to focus the investigation on a machine located on N.E. Davidson Road in the immediate vicinity of the Knollwood Apartments, because that machine had been vandalized more than any other. The Knollwood Apartments and the machine under surveillance were within the Carpenter route, which Hill leased.

The Kansas City Bureau of Investigation employed Joseph Heilig and assigned him the task of conducting the surveillance of the Knollwood machine. Heilig made a written report concerning incidents he had observed on January 24 and 26, 1980. Heilig reported that at 5:15 a.m. on January 26 a van stopped near the Knollwood machine and a young man emerged from the van. The man walked across the street directly to the machine, opened the door, got a paper, and, while he held the door open, he took pliers, or a similar tool, and did something to the lockplate. The van had driven off when the man got out of the van. The van then pulled into an apartment drive. The man walked from the machine with a paper in his hand, into a drive at the apartment complex. There, he was picked up by the van. Heilig immediately went to the machine and found that both horns on the lockplate had been broken off.

On January 24 Heilig had observed the same man he saw tampering with the machine on January 26 at another machine owned by the Star. Heilig observed that machine had been damaged.

Heilig identified the driver of the van whom he saw on January 26 as Robert O. Hill, and Heilig identified the man who went to the machine and damaged it as Craig Hill, the son of Robert. Heilig also said Craig damaged the other machine on January 24.

Based on Heilig's report, the circulation manager of the Star wrote to Hill on January 29 that Hill had been observed to stop the truck he was driving and wait for a passenger, while the passenger went to a vending machine owned by the Star and broke the locking mechanism on the machine. The letter stated the passenger returned to the truck Hill was driving and

Hill drove off. The letter advised Hill that, by reason of Hill's participation in the destruction of property owned by the Star, Hill's contract with the Star for newspaper delivery was cancelled as of January 31, 1980.[1] The letter further informed Hill that the Star would not tell Carpenter and Trout of the circumstances, but would notify them that after February 8 the Star would not sell them newspapers for delivery by Hill and that they should make other arrangements for the delivery of newspapers on their routes.

Hill testified that after receiving this letter he went to the Star and attempted to talk with the circulation manager, but was refused because the Star had other litigation pending with its independent contractors.

The Star wrote Carpenter and Trout that, because of circumstances which it declined to disclose, after February the Star would no longer sell newspapers to them for delivery by Hill. Hill did talk with officials at the Star and obtained permission for his wife to deliver newspapers on the Carpenter and Trout routes. Later, the Star agreed that Craig Hill could deliver newspapers. The Star also agreed that Hill could assist his wife for short periods during emergencies. As a result of the letters from the Star, Carpenter and Trout terminated their agreements with Hill.[2]

About three months after the January 26 incident, Craig Hill was charged in municipal court with vandalizing the machine. The charge against Craig was dismissed after a hearing and apparently after some conversation between the attorneys and the municipal judge in his office.

Janet Dow was a friend of the Hills and became concerned when she learned that the Star had terminated its relationship with Hill. Dow called the Star's circulation manager and asked why the Star had terminated Hill's contract. She testified the manager told her in a rude and loud tone:

Lady, Mr. Hill will never carry another paper when we get him to court ... we had him followed all over North of the river because he vandalized property all over North of the river and the detective can prove this, but we will take him to court.

In September of 1980 Mrs. Marion O'Brien wrote a letter to the Star in which she requested permission for Hill to assist her in the delivery of the newspapers because of the illness of her husband, who had a contract with the Star for delivery. The Star replied that it would not give its approval for Hill to participate in the distribution of newspapers on the O'Brien route.

Hill testified that he had delivered the Star newspapers for 31 years and had never had a complaint from anyone concerning his service. He stated he knew of no reason other than the January 26 incident that would explain the Star's action in refusing to allow Hill to deliver papers for Carpenter, Trout, and O'Brien.

Hill denied that he let anyone out of his van on January 26 who went to the Star machine and denied any knowledge or participation in vandalism of the Star machines. Hill testified that he owned some machines and that his machines had also been vandalized. Craig Hill testified that he was not with his father on the morning of January 26 and denied participating in any vandalism on that date or on January 24. He also testified to the favorable termination of the charge against him in the municipal court. Hill also produced Don Knudson, who testified that he was assisting Hill on the morning of January 26. Knudson denied that he had been near the Star machine or had damaged it.

Hill also produced Heilig as a witness. Heilig testified to his observations of Craig Hill damaging a machine on January 24

1. Hill's petition did not make any allegation concerning the termination of his delivery contract with the Star, and no issue is raised on this appeal concerning the termination of that agreement.

2. Hill's wife, Lois, continued to operate the Trout route; however, she said the profit was smaller because she had to have more help than Hill would have required if he ran it.

and testified to the incident on January 26. Heilig testified that on January 26 he had a good view of the two persons in the van and identified them as being Hill and Craig.

There is little, if any, dispute about the facts as recited herein. The principal dispute at trial was whether or not Hill participated in the vandalism of the machine with his son Craig on January 26.

■ The parties agree that, as stated in *Minnesota Mining & Manufacturing Co. v. Williamson,* 675 S.W.2d 951, 958[6] (Mo. App.1984), in a tortious interference with contract case, the burden is on the plaintiff to prove the defendant's conduct was unjustified. *Williamson* sets out the elements of the cause of action for tortious interference. 675 S.W.2d at 953[1]. The key element on this appeal is the absence of justification.

■ The Star contends that Hill's evidence does not prove a lack of justification. If the Star acted without improper means to protect a valid, existing economic interest of its own, its interference with Hill's contracts would not be tortious. *See Pillow v. General American Life Insurance Co.,* 564 S.W.2d 276, 282[7] (Mo.App.1978). There is no evidence that the Star used tortious or illegal means to interfere with Hill's contracts. The Star argues that in *Francisco v. Kansas City Star Co.,* 629 S.W.2d 524, 534[12] (Mo.App.1981), this court held that the Star has a protectable, bona fide, legal economic interest concerning delivery of its newspapers and proper service of delivery routes. If there were reason to believe Hill was participating in crimes against the Star, the Star was amply justified in believing Hill to be untrustworthy in servicing the Star's routes.

Hill contends that he was not involved in the vandalism and points to a discrepancy between the letter written by the Star and Heilig's report to prove that the Star did not rely on Heilig's report as justification for refusing to allow Hill to deliver its newspaper. The discrepancy is said to be found in the statement in the letter that Hill waited while the passenger went to the machine and returned to the van, whereas Heilig stated that the van drove away after the passenger alighted and returned within two or three minutes to pick him up. Hill also contends that the statements the circulation manager made to Dow indicate some reason other than the January 26 incident for the termination.

The two instances Hill relies on did not prove an absence of justification. The discrepancy between the language of the letter and Heilig's report is of no consequence. From Heilig's report the Star could have simply concluded that Hill in effect waited for his passenger to return from his mission, even though Hill drove a short distance before picking him up. Whether or not Hill waited in place or drove off and returned, there was still evidence that the Star reasonably believed Hill had participated in the vandalism, and Hill introduced no evidence tending to show that the Star did not so believe. Likewise, the conversation with Dow was clearly predicated on the observation reported to the Star that Hill had been involved in vandalism of the Star machine. The two items do not prove an absence of justification.

The evidence clearly showed that the Star acted only after receiving Heilig's report of his observation on January 26. The Star certainly had a protectable economic interest in delivery of its newspapers under its contracts with Carpenter, Trout and O'Brien, as held in *Francisco,* and in preventing further vandalism of its machines by Hill. The Star was justified in taking the action it took against Hill on the basis of its belief that Hill had vandalized Star property. *Federal Auto Body Works, Inc. v. Aetna Casualty & Surety Co.,* 447 A.2d 377 (R.I.1982).

Hill's efforts to disprove the accuracy of the Heilig report and to prove that he was not involved in the vandalism are beside the point. Hill's burden was to prove an absence of justification for the Star's action. He did not carry that burden by seeking to prove he did not commit vandalism. The question was not whether or not Hill was involved in vandalism; the ques-

tion was whether Hill proved the Star was not justified in taking the action it took. *Institutional Food Marketing Associates, Ltd. v. Golden State Strawberries, Inc.,* 587 F.Supp. 1105, 1111 (E.D.Mo.1983), *aff'd,* 747 F.2d 448 (8th Cir.1984). To carry his burden Hill had to show that the Star acted without belief that Hill participated in the vandalism. *See Golden State Strawberries,* 587 F.Supp. at 1111. Whether or not Heilig was mistaken in his observation is irrelevant. Hill's own evidence shows that Heilig reported to the Star that Hill was involved in the vandalism. The evidence is undisputed that the Star acted on Heilig's report. There is no evidence that the Star was motivated by some reason other than Heilig's report. Based on the information it had, the Star was justified in taking the action it took. Without any evidence to show that the Star's acts were unjustified, Hill has failed to prove the essential element of absence of justification.

The judgment on each of the three counts against the Star is reversed and this cause is remanded for entry of judgment in favor of the Star on each count.

All concur.