**BRINER ELECTRIC COMPANY,**
**Plaintiff-Respondent,**

v.

**SACHS ELECTRIC COMPANY,**
**Defendant-Appellant.**

No. 45704.

Missouri Court of Appeals,
Eastern District,
Division Two.

Sept. 25, 1984.

Motion for Rehearing and/or Transfer to
Supreme Court Denied
Oct. 30, 1984.

Application to Transfer Denied
Dec. 18, 1984.

Robert S. Allen, Michael A. Vitale, Lewis, Rice, Tucker, Allen & Chubb, St. Louis, for defendant-appellant.

Lashly, Caruthers, Baer & Hamel, Rexford H. Caruthers, Barry & Bresnahan, James T. Barry, Jr., Linda M. Dougherty, St. Louis, for plaintiff-respondent.

SIMON, Judge.

Sachs Electric Company (Sachs) appeals from a judgment entered in favor of Briner Electric Company (Briner) on a jury verdict in the Circuit Court of the County of St. Louis. The claim is founded on tortious interference with a business expectancy and the jury awarded Briner actual damages of $213,000 and punitive damages of $405,000.

On appeal, Sachs contends the trial court erred in (1) failing to grant Sachs' motions for a directed verdict and judgment notwithstanding the verdict for the reason that Briner failed to make a submissible case in that it did not prove the necessary elements for tortious interference with a business expectancy; (2) excluding relevant and material testimony and exhibits; (3) submitting a verdict director not requiring the jury to find that Sachs had knowledge of Briner's expectancy; (4) failing to grant Sachs' motions for a directed verdict and judgment notwithstanding the verdict in that the evidence was insufficient to support actual damages; (5) submitting instruction for punitive damages for the reason that, as a matter of law, Briner was not entitled to punitive damages in that Briner failed to prove actual damages, actual malice and a knowing commission of a wrongful act; (6) instructing the jury as to punitive damages before instructing as to actual damages in that this order of instructions gave undue prominence to the punitive damage issue; and (7) failing to grant Sachs' motion for a new trial or, in the alternative, a remittitur for the reason that the awards of actual and punitive damages are arbitrary, excessive and unsupported by the evidence. We reverse.

Reviewing the submissibility of Briner's claim, we view the evidence in a light most favorable to Briner, giving it the benefit of all reasonable inferences deduci-

ble from the evidence. *Francisco v. Kansas City Star Company,* 629 S.W.2d 524, 530 (Mo.App.1981). Further, Briner must produce substantial evidence supporting each element of its cause of action, all inferences of essential facts must be based on substantial evidence and liability cannot be based upon speculation, conjecture or guesswork. *Tri-Continental Leasing Co. v. Neidhardt,* 540 S.W.2d 210, 211 (Mo. App.1976). With these principles in mind, we set out the facts necessary to a determination of the submissibility of Briner's claim.

During the latter part of 1976 and early part of 1977, Barnes Hospital decided to construct its New West Pavilion and selected four general contractors from whom it would accept bids for the project. The general contractors were limited to the subcontractors chosen by Barnes. Sachs and Briner were two of the six electrical subcontractors selected by Barnes.

On May 16, 1977, Wischmeyer, the architectural firm in charge of the project, issued to the general contractors invitations to submit bids for the construction to Mr. Frank, the president of Barnes. The bidding deadline for the general contractors was originally 2:00 p.m. on June 28, 1977, but was changed to 2:00 p.m. on July 8, 1977. Included with the invitations was a specification containing a detailed procedure concerning the submission of bids. Applicable to prime sub-contractors, such as Briner and Sachs, was the requirement that they submit the bid to the general contractors and a copy of the bid to Barnes by 10:00 a.m. on July 7, 1977. No modifications, withdrawals or cancellations were allowed after this time. Further, combination bids were prohibited by any prime sub-contractor who did not normally en-

gage in the categories of work included in a combination bid.[1] Any modification in this procedure, to be effective, was to be issued by the architect in writing to all concerned parties no later than four days before bids were due.

Proceeding according to the specification, Briner submitted an electrical bid of $5,242,250. Sachs' electrical bid submitted to McCarthy on July 7, 1977, was $5,480,-000.[2] Briner's electrical bid was the lowest submitted by the electrical prime sub-contractors.[3] McCarthy Bros., the general contractor ultimately awarded the job by Barnes, testified that but for the combination bid submitted subsequently by Sachs, Briner would have been awarded the electrical sub-contracting work.

On July 6, Mr. Krause, an employee of Sachs, called Frank to obtain permission to submit a combined bid. Krause contacted Frank despite the fact that Krause knew the specifications instructed that all questions should be directed to the architects. Krause was also aware that Barnes had assigned internal responsibility for the project to another employee. During the call Krause represented to Frank that substantial savings could be achieved by Barnes if it allowed the bid. At that time, however, no combination bid actually had been prepared, nor was Krause sure of exactly how much, if anything, could be saved. Frank, whose son worked for Sachs at the time, gave his tentative approval for the bid. After checking with the architect, Frank called Sachs and gave his complete assent to the combined bid.

Late in the afternoon of July 7, 1977, Krause called McCarthy to inform them Sachs intended to submit another bid, a combination bid. Krause informed McCar-

1. A combination bid is one for which a subcontractor would provide different types of work. For example, a combination bid might include electrical and mechanical work. Only a subcontractor who normally engaged in the different types of work could submit such a bid.

2. Sachs submitted a bid to Barnes for $5,339,-635. The reason for the discrepancy was to some way avoid exposure of the real bid to

Sachs' competitors. The logic behind this, contained in the transcript, is not clear.

3. The bids of the other electrical subcontractors were as follows:

| | |
|---|---|
| Aschinger Electric | $7,341,593 |
| Mack Electric | $6,698,000 |
| Kaiser Electric | $6,600,000 (submitted late) |
| Guarantee Electric | $6,177,777 (submitted late) |

thy that this had been cleared through Barnes. That night, Sachs met with Niehaus Interiors, Inc. and Environmental Interiors, Inc., drywall and ceiling work subcontractors, to discuss the possibility of submitting a combination bid. The three firms eventually agreed on a combination bid which was submitted to McCarthy on the morning of July 8, 1977. The amount of the bid was lower than the total of the firms' three separate bids. This was possible due to a belief that costs could be reduced by combining. A comparison of the separate bids and the combination bid is as follows:

|  | Separate Bid | Combination Bid | Reduction |
|---|---|---|---|
| Sachs | $5,339,636 | $5,153,542 | $186,093 |
| Niehaus | $2,298,485 | $2,133,958 | $164,527 |
| Environmental | $ 399,500 | $ 374,950 | $ 24,550 |
|  | $8,037,620 | $7,662,450 | $375,170 |

The reason given by Sachs for submitting a combination bid was that it believed that Guarantee Electric, another electrical sub-contractor involved in the bidding, intended to submit a combination bid. Sachs felt it had been denied the contract on another project because of a combination bid filed by Guarantee. It appears that Sachs did not meet the requirements set forth in the specifications for combination bids in that it was not normally engaged in drywall and ceiling work. On the other hand, Guarantee apparently was normally engaged in such work.

Sachs learned that Briner had been the low electrical bid in the early afternoon of July 8, 1977 after a meeting it had with Tarlton Construction, one of the general contractors. The meeting concerned submission of Sachs' combination bid to Tarlton. This appears to be the only instance evidencing Sachs' knowledge that Briner had submitted a bid and was the low electrical bidder.

McCarthy received Sachs' bid on July 8, 1977. On that day, McCarthy assembled its bid to Barnes based on the sub-contracting bids it had received. In arriving at its bid to Barnes, McCarthy compared the lowest bids of electrical, drywall, and ceiling work with Sachs' total combined bid. Since Sachs' combined bid for the three types of work was less than the total of the lowest three separate bids, which included Briner's electrical bid, Sachs' combined bid was chosen. Subsequently, McCarthy was selected by Barnes as the general contractor and Sachs was thereby awarded the electrical work.

The verdict director on which the cause was submitted is a modification of MAI 23.11 and reads as follows:

Your verdict must be for plaintiff if you believe:

First, a business expectancy existed between plaintiff and McCarthy Bros. Construction Company which was terminated by McCarthy Bros. Construction Company, and

Second, defendant caused McCarthy Bros. Construction Company to terminate the business expectancy of plaintiff, and

Third, defendant did so intentionally and without justification or excuse, and

Fourth, plaintiff was thereby damaged.

The jury found for Briner and awarded actual damages of $213,000 and punitive damages of $405,000. At trial, Briner claimed, as actual damages, its lost profits of $618,000. This amount is the difference between the bid amount ($5,242,250) and the costs assigned to the work by Briner ($4,624,250). Briner supported this contended amount by introducing its financial statements into evidence and testimony of its certified public accountant.

The elements required for tortious interference with a valid business expectancy are: (1) the existence of a valid business expectancy; (2) knowledge of the expectancy by Sachs; (3) intentional interference by Sachs which induces breach of the expectancy; (4) absence of justification; and (5) damages. *Francisco v. Kansas City Star Company*, 629 S.W.2d 524, 530 (Mo.App. 1981).

We find that Briner failed to prove the fourth element and therefore failed to present a submissible case. Sachs' conduct was justified competition. Since our reso-

lution of this point is dispositive, we do not decide whether any of the other elements were proved.

The question of competition justifying an intentional interference with another's business relations is dealt with in Restatement (Second) of Torts § 768 (1979). That section states:

Competition as Proper or Improper Interference (1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if

(a) the relation concerns a matter involved in the competition between the actor and the other and

(b) the actor does not employ wrongful means and

(c) his action does not create or continue an unlawful restraint of trade and

(d) his purpose is at least in part to advance his interest in competing with the other.

(2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.

Comment e explains the "wrongful means" used in clause (b) which would be prohibited. The comment states that "physical violence, fraud, civil suits and criminal prosecutions are all wrongful in the situation covered by this Section." *See also* Comment b § 766 B Restatement (Second) of Torts (1979).

■ Although no Missouri cases have addressed the extent to which competition justifies an interference with another's business relations, we believe that § 768 accurately expresses Missouri law as to the justification element of the tort in an action between competitors. That section strikes a balance between unrestrained competition and protection of justified business expectations. In essence the rule states that competitive conduct which is neither illegal nor independently actionable does not become actionable because it interferes with another's prospective contractual relations.

Our conclusion is buttressed by a review of Missouri cases dealing generally with the tort of intentional interference with business relations. *Fischer, Spuhl, Herzwurm & Associates, Inc. v. Forrest T. Jones & Co.*, 586 S.W.2d 310 (Mo. banc 1979) is perhaps the closest to the present situation, as it too was an action between competitors. In *Fischer*, the trial court dismissed a petition that alleged conduct violating state antitrust laws and a tortious interference with business relation. The Supreme Court, sitting en banc, reversed on both counts. The court, after determining that the pleading alleged conduct violating antitrust laws, also determined that the petition pleaded a claim for tortious interference with business relations. The conduct involved *"illegal* 'tying' agreements ... and other anticompetitive agreements...." *Id.* at 315 (emphasis added). Although the court did not mention § 768, we note that the conduct alleged would be actionable under that section. Indeed, the United States Court of Appeals for the Eighth Circuit read *Fischer* as being consistent with the Restatement view. *Superturf, Inc. v. Monsanto Co.*, 660 F.2d 1275, 1286 (8th Cir.1981).

In addition, our conclusion is consistent with *Downey v. United Weatherproofing, Inc.*, 363 Mo. 852, 253 S.W.2d 976 (1953), the seminal Missouri case on this type of action. *Downey* involved allegations of business slander which caused breaches of existing contracts and interfered with plaintiff's future business relations. In holding that an action could be maintained for interference with future business relations, the court stated: "An existing contract may be a basis for greater protection, but some protection is appropriate against unjustified interference with reasonable expectancies of commercial relations.... [T]he differentiation between them relates to ... the kind and amount of interference

that is justifiable in view of the difference in the facts." *Id.* 253 S.W.2d at 980.

In addressing the question of competition as justification, the court relied on the first Restatement of Torts, § 768 (1939). That section distinguished between prospective and existing contracts, as does Restatement (Second) of Torts § 768. Both sections allow a party to interfere with the *formation* of a competitor's contracts, so long as four conditions are met. The conditions, set out above, are essentially the same in both Restatements; the difference in the two sections being that the first Restatement speaks in terms of a privilege, usually an affirmative defense, while the second Restatement addresses the impropriety of the interference itself, usually a part of plaintiff's case. Inasmuch as the absence of justification, i.e., the impropriety of the interference, is an element of the tort under Missouri law, the Missouri approach is not inconsistent with the second Restatement.

Our conclusion is supported further by a perusal of other states which have considered § 768. Particularly instructive are two Colorado cases addressing the question: *Memorial Gardens, Inc. v. Olympian Sales & Management Consultants, Inc.,* 661 P.2d 296 (Colo.App.1982) (cert. granted to Colorado Supreme Court, March 7, 1983) and *Dolton v. Capitol Federal Savings & Loan Ass'n,* 642 P.2d 21 (Colo. App.1981). In *Memorial Gardens,* the parties were competitors in the field of preneed funeral plans. The defendant induced some of plaintiff's customers to terminate their terminable at-will contracts with plaintiff. These customers then bought plans from defendant. Plaintiff sued alleging tortious interference with its contractual relations. It was stipulated that the contracts between defendant and plaintiff's customers involved the area of competition between the parties, and that defendant made no "false, fraudulent, derogatory, or untrue statements or representations about plaintiffs." The court affirmed a judgment for defendant on the basis that the defendant's conduct was justified competition. The court noted that an action would lie if

defendant used "wrongful means" to procure a breach of a contract, but held that the record supported the trial court's findings of justifiable competition.

In *Dolton,* the plaintiff was a real estate developer who was in competition with a subsidiary of the defendant bank. After plaintiff had received preliminary acceptance of his offer to purchase some property he approached the bank for financing. The subsidiary then made another offer which was accepted. Plaintiff sued the bank, the subsidiary, and the bank officer to whom he had spoken about the loan. Summary judgment was entered for all defendants. The Court of Appeals affirmed the judgment for the subsidiary on a tortious interference claim, holding that its bid for the property, before an enforceable contract had been entered into by the plaintiff, was justified competition. Although there was a factual question whether the bank and the bank officer breached a fiduciary duty by misusing confidential information, the subsidiary was plaintiff's competitor in real estate development and its actions were privileged as a matter of law. *See also M & M Rental Tools, Inc. v. Milchem, Inc.,* 94 N.M. 449, 612 P.2d 241 (N.M.App.1980); *Allied Security, Inc. v. Security Unlimited, Inc.,* 265 Pa.Super. 297, 401 A.2d 1219 (Pa.Super.1979).

Finally, we note that several Missouri cases have quoted and approved of various other Restatement sections dealing with other aspects of this tort. *See, e.g. Friedman v. Edward L. Bakewell, Inc.,* 654 S.W.2d 367 (Mo.App.1983) (quoting Restatement (Second) of Torts § 769 (1979)), dealing with an interference by one who has a financial interest in a contract, as an accurate statement of the law); *Francisco v. Kansas City Star, Co.,* 629 S.W.2d 524 (Mo.App.1981) (quoting with approval Restatement (Second) of Torts § 766 comments h and j (1979)), dealing with the element of intent); *Stanfield v. National Electrical Contractors Ass'n, Inc.,* 588 S.W.2d 199 (Mo.App.1979) (citing with approval Restatement (Second) Torts § 766 comment g (1979), dealing with breach of

contracts terminable at will.). In the interest of developing a comprehensive and consistent set of principles we adopt § 768 as a clear statement of the rule relating to the justification of competition.

 We now apply these principles to the facts of this case. At the outset, it is clear that any interference was in the area of competition between Sachs and Briner. Further, it is also clear that Sachs' acts were an attempt to further its own business interest, i.e., to get the contract for itself. Thus, there is no question that two of the four conditions of § 768 are met. In addition the record fails to support any finding of an unlawful restraint of trade. At the close of Briner's evidence, motions for directed verdict of Environmental Intenions Inc., Neihaus Intenions, Inc. and Barnes Hospital were sustained. They are original named defendants with Sachs. Briner does not contest the trial court's action in the sustention of the motions. The question therefore is whether appellant utilized wrongful means in obtaining this contract.

The record fails to reveal any evidence of wrongful means. As noted earlier, wrongful means would generally entail either an illegal act or an act that is actionable in and of itself. The evidence, viewed in the light most favorable to the verdict, does not show any act rising to that level. It does show that Sachs blatantly disregarded the bidding documents and conducted private negotiations, unknown to any of its competitors. Indeed, these are the very acts to which Briner points as the wrongful means employed. However, these acts, while perhaps unsporting, do not rise to the level of wrongfulness. A contrary holding would effectively preclude the submission of nonconforming bids, and thereby bind Barnes to the terms of the specifications. Barnes specifically sought to avoid this by reserving the right to waive irregularities in the bids. We decline to accomplish indirectly what Barnes directly sought to avoid, believing instead that regulation of compliance with the bidding documents is best left to the parties themselves, who stand in the best position to control that compliance, and who will bear the burden of or reap the gain from their decisions.

Having concluded that plaintiff failed to prove that defendant's acts were without justification, we reverse the judgment of the trial court. Our disposition of the case on this point renders unnecessary a discussion of the other points relied on.

Judgment reversed.

CRIST, P.J., and PUDLOWSKI, J., concur.