**NATIONAL ADVERTISING COMPANY,**
**Plaintiff-Appellant,**

v.

**Robert HEROLD, J.D. Mead, Steven F. Pranka, Eugene F. Doerr and City of Berkeley, Defendants and Gannett Outdoor Company of Kansas City d/b/a Gannett Outdoor Company of St. Louis, Intervenor-Defendant, Defendants-Respondents.**

**No. 51523.**

Missouri Court of Appeals,
Eastern District,
Division Three.

June 23, 1987.

Motion for Rehearing and/or Transfer
Denied July 30, 1987.

Application to Transfer Denied
Sept. 15, 1987.

Patrick C. Dowd, Larry A. Reed, St. Louis, for Nat. Advertising Co.

Rudy D. Beck, Beck, Tiemeyer & Zerr, St. Charles, for Robert Herold, J.D. Mead, Steven F. Pranka and Eugene F. Doerr.

Louis S. Czech, Clayton, Gary W. Bomkamp, Roberts, Perryman & Bomkamp, St. Louis, for City of Berkeley.

Robert C. Jones, William J. Bruin, Ziercher & Hocker, Clayton, for Gannett Outdoor Co.

CRANDALL, Judge.

Plaintiff, National Advertising Company (National), appeals from the judgment of the trial court in favor of defendants, Robert Herold, J.D. Mead, Steve Pranka and Eugene Doerr d/b/a The Realty Company (Realty Co.) and City of Berkeley (Berkeley); and in favor of defendant-intervenor, Gannett Outdoor Company of Kansas City d/b/a Gannett Outdoor Company of St. Louis (Gannett), permanently enjoining National from impeding Realty Co.'s and Gannett's use of certain real estate and ordering National to remove an outdoor advertising sign from the property. We affirm.

Our standard of review is that of a court-tried case. The evidence at trial established that National and Gannett were in the business of renting outdoor space on which to place advertising signs. Realty Co. owned real estate in St. Louis County which was uniquely situated between the north and south bound lanes of an interstate highway, I–170. The parcel immediately adjacent to Realty Co.'s property was owned by a railroad. Both parcels were subject to the Missouri Highway Beautification Act, particularly those sections regulating billboards. *See* Sections 226.500–226.600 RSMo (1986).

Realty Co. initially contacted Gannett about renting the property. A rental price of $6,000 was discussed. On February 1, 1984, Realty Co. also initiated negotiations with National for the purpose of leasing that same parcel of land. On February 2, Realty Co. and a representative of National signed a lease agreement on a standard form furnished by National. National paid no money to Realty Co. at this time.

Paragraph 4 of the agreement provided in pertinent part:

In consideration of the foregoing and the mutual promises herein contained and other good and valuable consideration, the Lessee agrees to pay the Lessor at the rate of $1000.00 for 90 days. Lease will commence at $500/mo at end of 90 days at the rate of $6000.00. 1st 5 years and then escalate to $7200 for 2nd 5 year period....

Paragraph 8 of the agreement read: "This lease shall be deemed to have been accepted and its terms enforceable only upon acceptance hereof by lessee in the space provided." The bottom of the front side of the document contained the following:

Accepted:
NATIONAL ADVERTISING COMPANY, LESSEE
By ——————————

Realty Co. did not designate a time period during which the lease had to be accepted. Realty Co. informed National that it was also meeting with Gannett regarding a lease on the property.

On February 3, 1984, National applied for and was issued a permit by Berkeley to erect a sign on Realty Co.'s property. The basis for the issuance of the permit was the agreement signed by Realty Co. as the owner of the property.

That same day, Realty Co. met with Gannett to discuss the possibility of leasing the property. At the same time, Gannett was applying to the railroad for a lease on the adjacent property.

On February 9, 1984, after receiving authorization from the State Highway Department, National erected a temporary sign on Realty Co.'s land. Realty Co. did not request that National put up this sign and was surprised when it saw the sign in place. National intended this sign to preserve its priority to erect a sign in that

particular location in conformity with Section 226.540(3)(a)a, which provides that "[n]o sign structure shall be hereafter erected within five hundred feet of an existing sign on the same side of the highway...."

On February 10, 1984, National informed Realty Co. that a decision would be reached by February 15. Realty Co. replied that it needed an answer by February 10. Realty Co. did not, however, revoke its offer at that time.

That same day, Gannett obtained a building permit from Berkeley and put up a temporary sign on the railroad real estate. At this point in time, Gannett had no lease with the railroad for that parcel. The newly erected sign was within 500 feet of National's sign. On February 10, Gannett increased its offer to $8,000 per year to lease the property and informed Realty Co. that, if Gannett built a permanent sign on the railroad's property, it would then be impossible for a sign to be erected on Realty Co.'s property.

On the morning of February 13, 1984, in Dallas, Texas, National signed the agreement, accepting the lease with Realty Co. It did not, however, communicate its acceptance to Realty Co. That same morning, unaware of National's acceptance, Realty Co. entered into a lease with Gannett. Realty Co. sent written revocations of its offer to National, initially by mailgram and then by hand delivery to National's home office in Hamel, Illinois. No one at the home office informed Realty Co. that the lease had been executed in Dallas.

On February 14, 1984, National delivered its acceptance and a check for $1,000 to Realty Co.'s office. The check was returned to National. On February 29, National received notice from Berkeley revoking its permit for the temporary sign. On March 1, the State Highway Department sent notices to Gannett to remove the sign on the railroad's property and to National to remove the sign on Realty Co.'s property for violation of the 500 foot spacing requirement. On March 7, National requested administrative review of the highway department's decision which resulted in the

subsequent withdrawal of the removal order on June 6. On March 9, Berkeley reissued a building permit to National for a permanent sign which had to be in place by March 23. On March 17, National commenced construction of an advertising sign. That same day, Berkeley's police department requested that National's work crew suspend work on the sign. The trial court subsequently issued an injunction against National and ordered the removal of the sign from Realty Co.'s land.

■ Preliminarily, we note that the lease agreement was executed in Texas and the contract contained no choice of law provision. Several contractual contacts indicate that Missouri law is the applicable law in this case: the lease agreement was for real property located in Missouri; the agreement was negotiated in Missouri; performance was to occur in Missouri; and Realty Co.'s place of business was Missouri. *See, e.g., Nakao v. Nakao*, 602 S.W.2d 223, 226 (Mo.App.1980); Restatement (Second) of Conflicts of Law Section 188 (1971). We conclude that the interpretation of the contract rights and duties of the respective parties is governed by the law of the state of Missouri.

In its first point, National contends that the trial court erred in deciding that the Realty Co.'s offer was effectively revoked. National argues that it accepted Realty Co.'s offer by signing the agreement, as specified in the contract; and that such acceptance occurred prior to revocation of the offer by Realty Co.

■ There must be both a definite offer and an unequivocal acceptance for the formation of a contract. *Thacker v. Massman Const. Co.*, 247 S.W.2d 623, 629 (Mo. 1952). Where an offer calls for a promise from the offeree, notice to the offeror of acceptance on the offeree's part is essential to the formation of a contract. *Id.* "The offeror can revoke or withdraw his offer at any time before acceptance and communication of that fact to him, even though he may have agreed (without consideration) to hold the offer open for a specified time." *Sokol v. Hill*, 310 S.W.2d 19, 20 (Mo.App. 1958).

National relies on *American Institute of Marketing Systems, Inc. v. Brooks,* 469 S.W.2d 932 (Mo.App.1971) to support its position that the "last act necessary for the formation of a contract" occurred when National signed the agreement and not when National notified Realty Co. of its acceptance. In *American Institute,* this court stated:

> [I]ts plain meaning, as indicated by its words and composition, is that the contract became valid when it was accepted by AIMS; that a notice of acceptance would be sent Brooks, along with an executed copy of the agreement; ... We cannot read into this clause a requirement that the *notice of acceptance must be received* by Brooks in Alabama before the agreement becomes a valid contract.

*Id.* at 934 (emphasis added).

*American Institute* does not dispense with the necessity of notice of acceptance, as National contends. It merely states that *receipt* of notice of acceptance is not a prerequisite for the agreement to become a binding contract.

In the instant case, the offer to lease Realty Co.'s parcel of land was an open-ended offer which Realty Co. extended to two competing companies, National and Gannett. Each company was aware of Realty Co.'s negotiations with the other. The first company to reach an agreement with Realty Co. regarding the rental price would be granted the lease. When Realty Co. executed the form furnished by National, it was merely making a specific offer to National to enter into a lease if National accepted the terms set forth in the signed document.

National signed the lease agreement on February 13, 1984. It did not, however, attempt to notify Realty Co. of its acceptance of the terms of the lease either by letter or by phone. It did not tender the initial payment of $1,000 to Realty Co. Further, there is no indication that Realty Co. had dispensed with the need for notice of acceptance by National. Realty Co. had no adequate means of learning of the acceptance. Realty Co. clearly delivered the revocation to National before National took any steps toward communicating its signing of the offer to Realty Co. National failed to exercise reasonable diligence to notify Realty Co. of its acceptance of the contract before the revocation.

■ Because Realty Co. was free to revoke its offer anytime before acceptance by National, Realty Co.'s revocation was effective. No lease agreement ever came into existence between Realty Co. and National. National's first point is denied.

In its second point, National challenges the trial court's conclusion that there was no consideration to support Realty Co.'s being required to keep the offer open. In its third point, National alleges that Realty Co. is estopped to assert the revocation of its offer because of National's actions in reliance upon Realty Co.'s agreement to hold the offer open. Because both allegations of error focus on the act of National's placement of a temporary sign on Realty Co.'s property, we consider the points together. Point II views the erection of the sign as consideration because the benefit to Realty Co. was the preservation of the priority of its real estate for the eventual placement of a billboard in compliance with the Beautification Act's 500 foot spacing requirement. Point III views the erection of the sign as a change in position made by National in reliance upon Realty Co.'s representations that it would keep the offer open.

■ Consideration sufficient to support a contract may be either a detriment to the promisee or a benefit to the promisor. *Heath v. Spitzmiller,* 663 S.W.2d 351, 356 (Mo.App.1983). A person who accepts benefits may be estopped to question the existence, validity, and effect of the contract from which the benefits derive. *Long v. Huffman,* 557 S.W.2d 911, 915 (Mo.App. 1977).

■ Whether National bases the formation of a binding lease agreement on either an estoppel or a consideration theory is immaterial. Neither theory is supported factually by the record. There was no evidence that Realty Co. agreed to hold its offer open for a specified time period. In

fact, on February 10, Realty Co. warned National that, if National did not arrive at a decision by that day, it might possibly be too late to reach any agreement with Realty Co. National voluntarily undertook to place a temporary sign on Realty Co.'s property. Realty Co. did not induce National's performance by any promises of holding the offer open. Realty Co. is not estopped to deny the validity of the lease agreement.

■ With regard to the consideration question, Realty Co. did not request National to secure building permits and to erect a temporary sign. The establishment of a priority for the eventual placement of a billboard inured to National's benefit as well as to Realty Co.'s benefit. The priority would ensure National's right to erect a permanent advertising sign in the event that it accepted the lease agreement with Realty Co. The erection of the sign did not constitute consideration for the lease agreement. National's second and third points are denied.

Point IV challenges the finding by the trial court that Gannett did not tortiously interfere with National's contract with Realty Co. Points V and VI question the trial court's finding that Realty Co. and Berkeley, respectively, did not conspire with Gannett to tortiously interfere with the contract. In view of our holding that there was no binding lease agreement between National and Realty Co., these three points relating to tortious interference with contract are without merit and are denied in accordance with Rule 84.16(b).

In its seventh point, National alleges that the trial court erred in concluding that there was no tortious interference with a valid business expectancy by Gannett.

■ In the present case, the requisite elements of tortious interference with a valid business expectancy are as follows: (1) the existence of a valid business expectancy between Realty Co. and National; (2) the knowledge of the expectancy by Gannett; (3) the intentional interference of Gannett which induces the breach of the expectancy; (4) the absence of justification; and (5) some damages. *See Briner Electric Co. v. Sachs Electric Co.,* 680 S.W.2d 737, 740 (Mo.App.1984). The failure to prove any one of these elements results in the failure to present a submissible case. *See, e.g., Id.*

Here, National fails to prove the fourth element in that Gannett's conduct was justified competition. Restatement (Second) of Torts Section 968 (1979) states that one who intentionally causes a third person not to enter a prospective contractual relation with another who is his competitor does not interfere improperly with the other's relation as long as

(a) the relation concerns a matter involved in the competition between the actor and the other, and

(b) the actor does not employ wrongful means and

(c) his action does not create or continue an unlawful restraint of trade and

(d) his purpose is at least in part to advance his interest in competing with the other.

■ Applying these principles to the facts of this case, it is clear that any interference by Gannett was in the area of competition between Realty Co. and National. Gannett's acts were an attempt to further its own business interests; i.e., to secure the lease of the space for itself for the purpose of erecting an advertising sign. Realty Co. had informed Gannett that it was negotiating with National but had entered into no contract with National. The record also does not support any finding of an unlawful restraint of trade by Gannett.

Finally, there is no evidence in the record that Gannett used any wrongful means to obtain the lease. "[W]rongful means would generally entail either an illegal act or an act that is actionable in and of itself." *Briner,* 680 S.W.2d at 743. National points to Gannett's erecting a temporary sign on railroad's adjoining property as the wrongful means employed by Gannett. This act precluded a sign's being erected on Realty Co.'s property because of the 500 foot spacing requirement. Gannett's act, however, does not rise to the requisite level of

wrongfulness. National's seventh point is denied.

In its next point, National contends that the trial court erred in failing to grant injunctive relief "to prevent continuing violations of National's lease." In its final point, National challenges the trial court's finding that Realty Co. was free to enter into a lease with Gannett. In view of our holding that no binding agreement existed between Realty Co. and National, these points are denied in accordance with Rule 84.16(b).

The judgment of the trial court is affirmed.[1]

PUDLOWSKI, P.J., and KAROHL, J., concur.

---

1. Berkeley's motion for damages for a frivolous appeal is denied.