**Eugene Debbs GOTT and Priscilla Gott, Plaintiffs–Appellants,**

v.

**FIRST MIDWEST BANK OF DEXTER and Kenneth Minton, Defendants– Respondents.**

No. 21398.

Missouri Court of Appeals,
Southern District,
Division Two.

Feb. 3, 1998.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 25, 1998.

Application to Transfer Denied
April 21, 1998.

Spencer L. Edwards, Dempster, Barkett & Edwards, L.L.C., Sikeston, for Appellants.

James E. Spain, Spain,Merrell & Miller, Poplar Bluff, for respondent Bank.

James R. Robison, Sikeston, for Respondent Minton.

PARRISH, Presiding Judge.

Eugene Debbs Gott and Priscilla Gott (plaintiffs) appeal a summary judgment entered in favor of First Midwest Bank of Dexter (Bank), formerly the First State Bank of Dexter, and Kenneth Minton (Bank and Mr. Minton are collectively referred to herein as defendants). Mr. Minton is a member of Bank's board of directors.

Summary judgment was entered on all counts of a first amended petition filed by plaintiffs. Count I was an action for breach of fiduciary duty against Bank. Count II was an action for breach of fiduciary duty against Kenneth Minton. Count III was an action for conspiracy to interfere with a business expectancy against defendants. Count IV was an action against defendants that sought damages due to duress with respect to plaintiffs' execution of a business document. This court affirms.

Plaintiffs owned real estate in Stoddard County, Missouri, consisting of more than 900 acres (the Gott farm). Eugene Gott inherited the property from his father, J.D.

Gott. When Eugene Gott inherited the property, it was subject to a deed of trust securing an indebtedness owed to Connecticut General Life Insurance Co. (Connecticut General). The record does not reveal the date of death of J.D. Gott. However, in 1978 plaintiffs obtained a loan from Puxico State Bank in the amount of $60,000. Plaintiffs secured the loan by a deed of trust on the real estate.

### Original Business Dealings with Bank

Plaintiffs first began doing business with Bank in 1981. They obtained a loan from Bank in the amount of $85,000. That loan (as well as other loans plaintiffs obtained from Bank in later years) was secured by deed of trust on the Gott farm. Plaintiffs used the proceeds from the 1981 loan to pay the 1978 loan owed to Puxico State Bank, to have a well drilled, and to pay for truck repairs and other miscellaneous expenses.

The 1981 loan was rewritten in February 1982. Jerry Don Dorton, who was executive vice president of Bank at that time, testified by deposition, "[W]ell, I redid the loan in February of 1982." The loan was rewritten for $103,900. He explained, "The purpose of this loan was to fully repay the original loan, which the payoff was $103,767.70. The 132–30 difference was for filing fees, filing expenses."

Mr. Dorton testified that at the time the original note was rewritten, Bank had received no payments, either principal or interest. He testified that the practice of rewriting a note to include unpaid interest, "capitalizing interest," was not uncommon; "[I]f a person had good collateral and they had a source of repayment, we weren't too concerned about rolling a note or capitalizing interest. It was commonplace in 1982."

In December 1982 plaintiffs borrowed an additional $19,228 from Bank. The proceeds of the loan were used to pay off the Connecticut General farm loan in the amount of $15,228 and provide plaintiffs an additional $4,000.

Bank rewrote plaintiffs' existing promissory notes again in February 1983. Bank loaned plaintiffs $250,000. The proceeds of this loan were used to pay the $103,900 note and its accrued interest of $20,129.16, and the $19,228 note and accrued interest of $158.92. Legal fees and title expenses of $1,483.95 were paid. Cash in the amount of $106,099.97 was disbursed to plaintiffs.

When Bank made the February 1983 loan, Mr. Gott was farming part of the Stoddard County land—he had done this since his father died. Part of the land was leased to Kenneth Minton. Later during 1983, Mr. Gott "leased" the land he had been farming to his son Bobby Gott for a term of three years.[1]

In June 1984, plaintiffs obtained an additional line of credit from Bank in the amount of $12,000. Six thousand dollars was paid to Kenneth Minton for "landgrading"; $2,929.66 was used to pay truck expenses; $1,070.34 was kept by plaintiffs. The balance was not disbursed.

On March 29, 1985, the balance plaintiffs owed Bank was $293,433.54. Plaintiffs applied to Bank for an extension on their loan. They also owed Kenneth Minton $84,838.17, a large part of which was owed for land leveling work he had done on their property.

Mr. Dorton was concerned about plaintiffs' business practices. Their loan with Bank had continually increased since they began doing business with Bank in 1981. Mr. Dorton believed Bank had adequate security, but questioned plaintiffs' ability to repay what they owed without selling their land. In March he told plaintiffs Bank would not continue to loan more money. He suggested that they look for another lender.

### Business Dealings with Kenneth Minton

Kenneth Minton's involvement with plaintiffs began before J.D. Gott died. He and his brother, Keith Minton, rented part of the Gott property and farmed it.[2] The Mintons

---

1. Bobby Gott paid little or no rent to plaintiffs during the three-year term of his lease.

2. Cane Creek divides the Gott farm. Approximately one-third of the farm is south of the

creek. The property Minton Brothers (and after their partnership was dissolved, Kenneth Minton) farmed was the part of the property south of

conducted business as a partnership. The partnership business name was Minton Brothers. Minton Brothers did not pay cash rent. They paid a share of the crops they raised as rent. In 1979, Minton Brothers partnership dissolved. Kenneth Minton kept the lease rights to the Gott property. Eugene Gott was indebted to the partnership. Kenneth kept the receivables.

After J.D. Gott died, Kenneth Minton continued renting the part of the Gott land he had been farming. In 1980, Kenneth Minton personally loaned Eugene Gott $14,830. That amount was used to repay the receivables the partnership had distributed to Kenneth Minton in the approximate amount of $8,000 plus accrued interest, and to provide Mr. Gott with an additional $5,000.

Part of the Gott farm was rented to plaintiffs' son, Bobby, during 1983, 1984 and 1985. In 1985, Kenneth Minton took over some of the acreage, 122 acres north of Cane Creek, that Bobby had been farming. Mr. Minton's rental arrangement for the 122 acres provided that he would pay a share of the crops he raised on that parcel as rent. Bobby Gott continued to farm the remainder of the tract he had been farming for the remainder of 1985.

In 1986, Kenneth Minton rented the north part of Gott farm, the part north of Cane Creek. The rental for that part of the farm was $18,500 per year. Mr. Minton continued renting the part of the farm south of the creek with the same rental arrangement that existed previously.

In 1987, the rental arrangement between plaintiffs and Mr. Minton was changed. He paid $18,500 per year rent for the north part of the farm and $21,000 for the south part. In 1988, the rent became $41,000. A new agreement was entered into in 1989 for a four-year term in which total rentals of $176,-500 would be paid. That amount was payable $54,000 in 1989, $39,000 in 1990, $39,000 in 1991, and $44,500 in 1992.

Cane Creek other than approximately 100 acres on the west side of that tract.

3. Kenneth Minton testified by deposition that he previously had a deed of trust on the land south

*Related Business Dealings Involving Plaintiffs, Bank and Minton*

In 1985, after Mr. Dorton told plaintiffs Bank would not make additional loans to them, plaintiffs requested that Bank release part of the property that secured their indebtedness to Bank. Bank agreed to release approximately one-third of the farm property so it could be used as collateral for another lender.

Kenneth Minton agreed to provide additional financing to plaintiffs upon being provided adequate collateral. He loaned plaintiffs $125,000; $84,865.28 of the $125,000 refinanced plaintiffs' prior indebtedness to Mr. Minton. The balance was used to reduce the indebtedness plaintiffs owed Bank. Bank then released its collateral interest in the part of the Gott farm south of Cane Creek. The farmland south of Cane Creek secured the loan from Kenneth Minton to plaintiffs.[3]

Bank agreed to rewrite plaintiffs' note upon plaintiffs reducing the balance owed to $255,000. Mr. Dorton testified in his deposition that Bank continued working with plaintiffs. The loan was rewritten in March 1985.

Bank and plaintiffs entered into the following Loan Agreement dated March 29, 1985:

This agreement between Eugene Debbs Gott and Priscilla Ann Gott (Debtor) and First State Bank of Dexter (Creditor) entered into today to entice the creditor to fund a loan in the amount of $255,000.00. Funds from the loan will be used to refinance debt on the farm land only. The signatures below indicate that the Debtor hereby agrees to the following restrictive covenants and any breech [sic] will automatically trigger full demand on the loan.

1. Bank must prior approve in writing the leasor [sic] (rentors) [sic] of all farm land owned by the debtors.

2. Debtor will not mortgage land or acquire any fixed assets over $5,000. without prior written consent of bank.

of Cane Creek. Until Bank released its deed of trust on that parcel, Mr. Minton's deed of trust had been subject to Bank's deed of trust.

3. Debtor will assign all leases negotiated with rentors [sic] to bank as collateral on this loan.

4. Debtors agree to apply all cash proceeds from farm, resulting via rent, direct government payments, or any other means to bank to reduce debt.

5. Debtor agrees to keep all taxes, and assessments paid current.

6. Debtor will maintain hazard insurance on all personally owned equipment on farm reflecting bank as lienholder.

/s/ Eugene Debbs Gott FIRST STATE BANK OF
Eugene Debbs Gott DEXTER

/s/ Priscilla A. Gott
Priscilla Ann Gott

/s/ Jerry Dorton
Jerry Dorton
Exec. Vice Pres.

On the same date, plaintiffs executed an agreement entitled "Assignment of Rents." Its stated purpose was "to assign to the Bank all rents now accrued and hereafter to be paid to them pursuant to any farm leases to which they are parties." The agreement states:

1. This assignment is made to the Bank for the use and benefit of Assignors' creditors, the Bank and Kenneth Minton and Revalee Minton, his wife, their heirs, personal representatives, successors and assigns, (herein, "Mintons") the Bank to hold, apply and disburse any funds received by it under this assignment and any proceeds therefrom as follows: Two–Thirds (2/3) for the benefit of the Bank and One–Third (1/3) for the benefit of Mintons.

The rental agreement for the years 1989, 1990, 1991 and 1992 between plaintiffs and Kenneth Minton is dated May 24, 1989. After identifying the parties to the agreement, describing the land being rented, stating the amount of rent and when it was to be paid, the agreement provides:

B. Notwithstanding any other provision of this lease to the contrary, Landlords [plaintiff] grant Tenant [Kenneth Minton] the following first right of setoff, which may be exercised by Tenant at his sole option and annually prior to the payment of any rent hereunder, and which will permit him to:

(1) Pay any real estate taxes due on the farm if the same are not paid by Landlords, the amount of which Tenant shall be entitled to deduct as a credit from the amount of rent next due from Tenant to Landlords; and,

(2) Deduct as a credit from the amount of rent next due from Tenant to landlord any other money which may be now owed by Landlords to Tenant or which may hereafter be loaned or advanced by Tenant to or on behalf of Landlords.

C. After deducting any amount claimed as a credit by setoff, Tenant annually shall pay the balance of the foregoing cash rent jointly to Landlords and First State Bank of Dexter.

. . .

Mr. Minton applied $4,331.78 of the rent he owed plaintiffs for 1989 to repay advancements he had made in 1988. In 1991 and 1992, he applied the total rent against the $125,000 plaintiffs owed him.

In 1991, plaintiffs' bank loan was in default. Bank began foreclosure proceedings on its deed of trust. Juanita Holden, plaintiffs' daughter, contacted Bank. She told Bank plaintiffs had executed a power of attorney designating her as their attorney-in-fact. She inquired if arrangements could be made to stop the foreclosure. Bank told Ms. Holden it would stop its foreclosure if interest on the note was paid to date and principal reduced by $5,000 to $10,000. This was not done. However, after a meeting between Ms. Holden's attorney and Bank's attorney, Bank stopped the initial foreclosure proceedings but started a new foreclosure to provide plaintiffs additional time in which to work something out.

Plaintiffs arranged a sale of the part of the farm that secured Bank's loan prior to foreclosure. Approximately 600 to 620 acres were sold. It included all of the land north of Cane Creek and about 100 acres south of the creek. The land was sold to Keith Minton, his sons Davis B. Minton and Bradley

Minton, and their wives. The sale price was $525,0000. One hundred thousand dollars of that amount was represented by a note payable to plaintiffs. It was secured by a second deed of trust on the property. All indebtedness secured by the part of the Gott farm that was sold was paid from cash proceeds from the sale price. After the debts were paid, $48,657.59 remained.

In 1992, Kenneth Minton began foreclosure proceedings on the part of the Gott farm that secured his loan to plaintiffs. Juanita Holden and her husband, Steve Holden, paid the balance of the note. Mr. and Mrs. Holden then purchased the remainder of the Gott farm from her parents.

### Issues on Appeal

Plaintiffs' allegations of trial court error are directed to the trial court granting summary judgment for defendants on Counts III and IV. They make no claim of error with respect to the award of summary judgment on Counts I and II.

Under Rule 74.04(c), the trial court shall enter summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *ITT Commercial Finance v. Mid–Am Marine*, 854 S.W.2d 371, 381[16, 17] (Mo. banc 1993). We review the record in the light most favorable to the non-movant. *Id.* at 382[18–21]. Facts set forth by affidavit or otherwise in support of a party's motion are taken as true unless contradicted by the non-movant's response to the summary judgment motion. *Id.* at 376[1–3]. We accord the non-movant the benefit of all reasonable inferences from the record. *Id.* Our review is essentially de novo. *Id.* at 376[4–6]. The propriety of summary judgment is purely an issue at law, and therefore we need not defer to the trial court's order granting summary judgment. *Id.*

Where the movant is a defending party not bearing the burden of persuasion at trial, it may establish a right to judgment by showing: (1) facts that negate any one of the claimant's elements facts; (2) that the non-movant, after a period of discovery, has not been able to produce evidence sufficient to allow the trier of fact to find the existence of any one of the claimant's elements; or (3) that there is no genuine dispute as to the existence of each of the facts necessary to support the moving party's properly pleaded affirmative defense. *Id.* at 381[16].

*J.S. DeWeese Co. v. Hughes–Treitler Mfg.*, 881 S.W.2d 638, 643–44 (Mo.App.1994).

Defendants filed separate motions for summary judgment. Both were granted.

Plaintiffs' first point on appeal asserts the trial court erred in granting the motions for summary judgment with respect to Count III, the claim for conspiracy to interfere with a business expectancy. They contend the trial court erred because Bank procured plaintiffs' execution of the 1989 lease to Kenneth Minton "under a threat of foreclosure without justification or excuse, regardless of whether or not the plaintiffs' note payable to [Bank] was in default, in that, (A) the 'first right of set-off' in the 1989 lease gave defendant Kenneth Minton the right to apply all of the plaintiffs' cash rent's [sic] towards amounts which the plaintiffs owed to defendant Kenneth Minton which caused a default of the plaintiffs' note payable to [Bank], (B) the annual cash rents under the 1989 lease were substantially below the fair market value which benefitted defendant Kenneth Minton and damaged the plaintiffs, and (C) the issue as to whether defendants' acts were justified is for the jury."

 "A civil conspiracy is proved by evidence that two or more persons have an agreement or understanding to do an unlawful act, and that, in pursuance of this agreement or understanding, they proceed to carry out their unlawful purpose to the damage of the plaintiff." *Preferred Physicians Mut. Management Group v. Preferred Physicians Mut. Risk Retention*, 918 S.W.2d 805, 815 (Mo.App.1996). The conspiracy is not what is actionable. *Id.* An unlawful act done in furtherance of a conspiracy is what is actionable. *Id.* "[T]he conspiracy has to do only with the joint and several liability of the co-

conspirators." *Id.* "[I]f the underlying act was not unlawful, there can be no claim for civil conspiracy." *Blaine v. J.E. Jones Const. Co.,* 841 S.W.2d 703, 713 (Mo.App. 1992).

A claim for tortious interference with a contract or business expectancy requires proof of each of the following: (1) a contract or a valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) absence of justification; and, (5) damages resulting from defendant's conduct. *Fischer, etc. v. Forrest T. Jones & Co.,* 586 S.W.2d 310, 315 (Mo.banc 1979).

*Community Title v. Roosevelt Federal S & L,* 796 S.W.2d 369, 372 (Mo. banc 1990).

■ In order to have a claim for interference with a valid business expectancy, it is necessary to determine if the expectancy claimed was reasonable and valid under the circumstances alleged. If it is not, there was nothing for defendants to have interfered with.

The business expectancy plaintiffs assert is stated in paragraphs 2 and 3 of Count III:

 2. Plaintiffs had an expectancy at all relevant times herein of receiving the fair market value in annual cash rental from farm land which is the subject of the 1989 Lease Agreement.

 3. Plaintiffs had an expectancy of selling Plaintiffs' farm land, which was subject of the 1985 Bank Deed of Trust, for a fair market value.

The 1989 lease provided that Kenneth Minton would lease the entire Gott farm for a period of four years paying $54,000 in 1989; $39,000 in 1990; $39,000 in 1991; and 44,500 in 1992—$176,000 rent for four years, an average of $44,125 per year.

In 1986 and 1987, Mr. Minton rented the north part of the farm. He paid rent in the amount of $18,500 for the north part of the farm for each of those years. In 1988, Mr. Minton rented the entire farm. He paid rent in the amount of $41,000.

Plaintiffs expressed dissatisfaction with the amount of rent they were receiving in 1989 when they attempted to negotiate a renewal of their loan with Bank. Mr. Dorton, the Bank officer with whom plaintiffs dealt, told Mr. Gott that in order to renew the loan, it would be necessary for him to have a source of repayment. Mr. Dorton explained in his deposition, "What I told Mr. Gott was if he did not lease the farm he could farm it himself or he could sell the farm, whatever he wanted to do, but he had to have a source of repayment. Either a third—some third party, or himself, that was reasonable."

Plaintiffs' loan had matured prior to their meeting with Mr. Dorton in May 1985. Mr. Dorton's recollection was that it had matured 30 or 45 days before the May 1989 meeting between him and Mr. Gott. He stated the loan needed some action, "either paid off or renewed." Mr. Gott was told Bank would give him a reasonable amount of time to find someone else to farm the ground. Mr. Dorton was asked if he had a sense of urgency about getting plaintiffs to sign the lease proposed by Mr. Minton on the day of his meeting with plaintiffs. Mr. Dorton answered, "No."

Plaintiffs did not attempt to find another lessor. They leased the property to Kenneth Minton for four years. Additionally, nothing in the record demonstrates that plaintiffs sought to sell the farm. The record does not reveal an interested purchaser or that plaintiffs had so much as discussed selling the farm with anyone.

Under these circumstances this court cannot conclude that plaintiffs had a reasonable and valid business expectancy involving leasing their farm to anyone other than Kenneth Minton or selling it. There was nothing for defendants to have interfered with. Furthermore, no absence of justification was shown.

■ Justification for interfering with another's business expectancy exists when one undertakes to protect a valid economic interest. *Community Title v. Roosevelt Federal S & L, supra.* There is justification when someone engages in competitive conduct. *Briner Elec. Co. v. Sachs Elec. Co.,* 680 S.W.2d 737, 741 (Mo.App.1984). There is justification for interfering with another's

business expectancy to avoid a substantial loss. *Gerstner Elec., Inc. v. American Ins. Co.,* 520 F.2d 790 (8th Cir.1975).[4]

One who has an existing economic interest in another's business affairs is privileged to interfere with a business expectancy to protect his own economic interest and is not liable for such interference if his action was one which he had a definite legal right to take without any qualification. *Community Title [v. Roosevelt Federal S & L],* 796 S.W.2d [369] at 372[8,9]; *Wigley v. Capital Bank of Southwest Missouri,* 887 S.W.2d 715, 720 (Mo.App. S.D. 1994). That is, protecting one's economic interest constitutes justification for interference with a business expectancy unless one employs improper means to protect that interest. *Beelman River Terminals, Inc. v. Mercantile Bank, N.A.,* 880 S.W.2d 903, 908 (Mo.App. E.D.1994). Improper means are those which are independently wrongful notwithstanding injury caused by the interference. *Id. Central Bank of Lake of the Ozarks v. Shackleford,* 896 S.W.2d 948, 956 (Mo.App.1995). *See also Friedman v. Edward L. Bakewell, Inc.,* 654 S.W.2d 367, 369–70 (Mo.App.1983).

■ Bank had an economic interest to protect. It had continually extended loans which went unpaid and were renewed with accrued interest "capitalized." The amount of plaintiffs' debt to Bank had reached the sum of $293,000. Plaintiffs demonstrated no inclination to repay the loans during the 10 years they had been Bank's customer. Bank's concerns about plaintiffs' business practice were warranted.

Bank imposed the requirement on plaintiffs, in order for their loan to be renewed, to find a means by which they could make payments that would reduce their indebtedness. Plaintiffs met this requirement by leasing their farm to Kenneth Minton for four years and assigning rent they would be entitled to receive to Bank.

Kenneth Minton had an economic interest to protect. He had extended credit to plaintiffs over a period of several years that remained unpaid. Plaintiffs owed him more

than $84,000. He loaned an additional amount to plaintiffs that permitted them to reduce the debt they owed Bank and obtain a renewal of their loan from Bank. After loaning the additional funds, plaintiffs owed Mr. Minton $125,000. He required the debt to be secured by a first deed of trust on part of plaintiffs' land. He also negotiated a right of set-off that permitted him to apply rental payments he would owe plaintiffs against their indebtedness to him.

■ The business dealings of Bank and Kenneth Minton with plaintiffs were within their respective legal rights. The fact that the results were not what plaintiffs may have anticipated is of no consequence. "The general rule of freedom of contract includes the freedom to make a bad bargain." *Bydalek v. Brines,* 947 S.W.2d 135, 143 (Mo.App.1997). Plaintiffs did not show an absence of justification on the part of either Bank or Kenneth Minton.

The trial court correctly found that the pleadings and discovery showed no genuine issue as to any material fact concerning the existence of a valid business expectancy and absence of justification by defendants. When, as a matter of law, there is no evidentiary support for an element of the tort pleaded, there is no issue of fact for submission to a jury. *Briner Elec. Co. v. Sachs Elec. Co.,* 680 S.W.2d at 740–41; *see also Baldwin Properties, Inc. v. Sharp,* 949 S.W.2d 952, 957 (Mo.App.1997). Point I is denied.

Point II is also directed to plaintiffs' claim for conspiracy to interfere with a business expectancy. It contends the trial court erred in granting defendants' motions for summary judgment because there is circumstantial evidence that supports their claim; that defendants, "by threat of foreclosure, coerced the plaintiffs to execute the 1989 lease for the purpose of financially benefitting the Bank's director, defendant Kenneth Minton, and giving defendant Kenneth Minton the right to apply all of the plaintiffs [sic] cash rents to amounts the plaintiffs owed defendant Kenneth Minton which caused a default of the plaintiffs' note payable to [Bank]."

---

**4.** In *Gerstner,* the federal court applied Missouri law. *See Minnesota Mining & Mfg. Co. v. Wil-* *liamson,* 675 S.W.2d 951, 957 (Mo.App.1984).

Circumstantial evidence is viewed no differently from direct evidence. *State v. Grim*, 854 S.W.2d 403, 406 (Mo. banc), *cert. denied*, 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993). The fact that plaintiffs rely on circumstantial evidence is not a factor in this court's review. The issue was whether there was a genuine issue as to any material fact. Rule 74.04(c)(3). As explained in discussing Point I, there was not. The facts do not support plaintiffs' claim that a valid business expectancy existed. The facts do not support an absence of justification for the actions taken by defendants. Point II is denied.

Point III is directed to Count IV of plaintiffs' first amended petition, a claim alleging that the 1989 lease by plaintiffs of the Gott farm to Kenneth Minton was executed under duress. Count IV seeks money damages based on the allegation that the 1989 agreement was the result of duress.

Count IV appears to be an attempt to assert a tort action. In addressing Point III, this court does not infer that such a cause of action exists. That issue has not been raised and is not addressed herein.[5]

Duress is tested by the state of mind induced by threat of another. *Weisert v. Bramman*, 358 Mo. 636, 216 S.W.2d 430, 434 (1948). " '[T]he ultimate fact in issue is whether the alleged injured party was bereft of the free exercise of his will power; . . . .' " *Id.* quoting *Coleman v. Crescent Insulated Wire & Cable Co.*, 350 Mo. 781, 168 S.W.2d 1060, 1066 (1943).

There was no evidence of duress. Mr. Gott's deposition testimony includes the question, "Did I understand you to say that the only person you are saying forced you to sign the lease was Ken Poteet?" Mr. Poteet was the bank officer who replaced Mr. Dorton and with whom plaintiffs dealt in 1989 and thereafter. Mr. Gott answered, "Right." Mr. Gott was then asked the question, "And the only thing he did is that he told you if you did not execute the lease he would foreclose against you?" He answered, "Right."

Mr. Poteet stated in deposition testimony that he did not ask plaintiffs to sign the lease; that he told them they could have some time to find someone else to lease the farm. He testified that he did not threaten foreclosure in his meeting with plaintiffs in May 1989, but informed them that Bank had to have some means of being repaid.

Regardless, plaintiffs' note that was secured by a deed of trust on the Gott farm was in default. Bank had a right to foreclose at that time. Plaintiffs concede this issue. Their brief states, "Certainly, a Bank has a right to foreclose upon a Deed of Trust, when the underlying Note and Deed of Trust is in default."

"[I]t is never duress to do that which a party has a legal right to do." *Brunswick Corp., Mercury Marine Div. v. Hering*, 619 S.W.2d 950, 954 (Mo.App.1981). Point III is denied. The judgment is affirmed.

MONTGOMERY, C.J., and SHRUM, J., concur.

---

5. Duress can be raised as a defense to a contract action in circumstances in which a party to the contract claims he or she was so oppressed by wrongful conduct of another in executing a contract that they were deprived of their own free will. *Schmalz v. Hardy Salt Co.*, 739 S.W.2d 765, 768 (Mo.App.1987). Duress has also been asserted as a basis for enjoining enforcement of a covenant. *Brunswick Corp., Mercury Marine Div. v. Hering*, 619 S.W.2d 950, 954 (Mo.App. 1981).